## Moore *v.* State.*

(En Banc. April 6, 1925.)

[103 So. 483. No. 24764.]

1. SEARCHES AND SEIZURES. *Constitution held to prohibit only unreasonable searches and seizures.*

   Section 23 of the Mississippi Constitution, which provides that, "The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized," does not prohibit all searches and seizures nor require a warrant in all cases therefor. It prohibits only unreasonable searches and seizures.

2. SEARCHES AND SEIZURES. *Reasonableness of search or seizure is judicial question for court in each case.*

   The reasonableness of a search or seizure is a judicial question to be determined by the court in each case, taking into consideration the place searched, the thing seized, the purpose for, and the circumstances under which the search or seizure was made, and the presence or absence of probable cause therefor.

3. SEARCHES AND SEIZURES. *Search of automobile or boat for intoxicating liquor without warrant is not unreasonable.*

   Because of the ease with which vehicles and boats can be moved beyond reach, a search thereof without a warrant, for intoxicating liquor being transported therein, the possession and transportation of which is unlawful, is not unreasonable, provided the search is made on probable cause. Consequently, such a search or seizure is not prohibited by section 23 of the Mississippi Constitution, and section 2, chapter 244, Laws of 1924, which provides therefor, is valid.

4. INTOXICATING LIQUORS. *Belief, based on information by credible person, that intoxicating liquor is being transported in automobile, is sufficient to justify search without warrant.*

   Belief by a police officer, based on information given him by a credible person, that intoxicating liquor is being transported in an automobile, is sufficient probable cause to justify a search by

him of the automobile without a warrant therefor under section 2, chapter 244, Laws of 1924.

ETHRIDGE and ANDERSON, JJ., dissenting.

---

*Headnotes 1.  Searches and Seizures, 35 Cyc., p. 1269; 2.  Searches and Seizures, 35 Cyc., p. 1269 (1926 Anno); 3.  Searches and Seizures, 35 Cyc., p. 1269; 4.  Intoxicating Liquors, 33 C. J., Section 377.

APPEAL from circuit court of Hinds county.

HON. W. H. POTTER, Judge.

Donovan Moore was convicted of possession of intoxicating liquor, and he appeals.  Affirmed.

*G. L. Teat* and *Geo. S. Hamilton,* for appellant.

This case presents squarely to the court for decision two questions:  (1) Whether the search and seizure was lawful or unlawful.  (2)  If unlawful, whether the evidence so obtained was admissible or inadmissible.

I.  It is appellant's contention that the search and seizure was in violation of section 23, Constitution of Mississippi, and was, therefore, illegal, because made wthout a search warrant.  To determine whether the search and seizure was lawful or unlawful it is necessary to consider the meaning of the word "unreasonable" as used in the Constitution with reference to search and seizure. To fully appreciate what the common law was, it is necessary to consider to some extent the history of its development.  There must have been a very definite idea in the minds of the framers of the Constitution when they used the word "unreasonable" for it is found in most of the Constitutions.

"The history of this amendment is given with particularity in the opinion of Mr. Justice BRADLEY, speaking for the court in *Boyd* v. *United States,* 116 U. S. 616, 29 L. Ed. 746, 6 Sup. Ct. Rep. 524.  As was there shown, it took its origin in the determination of the framers of

the Amendments to the Federal Constitution to provide for that instrument a bill of rights, securing to the American people, among other things, those safeguards which had grown up in England to protect the people from unreasonable searches and seizures, such as were permitted under the general warrants issued under authority of the government, by which there had been invasions of the home and privacy of the citizens, and the seizure of their private papers in support of charges, real or imaginary, made against them. Such practices had, also, received sanction under warrants and seizures under the so-called writs of assistance, issued in the American colonies. See 2 Watson, Const. 1414 et seq. Resistance to these practices had established the principle which was enacted into the fundamental law in the Fourth Amendment, that a man's house was his castle, and not to be invaded by any general authority to search and seize his goods and papers." See, also, *Weeks* v. *U. S.,* 56 L. Ed. 652, 232 U. S. 383.

At common law no power existed to make a search without a warrant. *People* v. *Case,* 27 A. L. R. 686; *State* v. *Welch,* 79 Me. 99, 8 Atl. 348; *Re Swan,* 150 U. S. 637, 27 L. Ed. 1207, 14 Sup. Ct. Rep. 225.

It was the determination of the people to confine searches and seizures to special warrants and to prohibit all other searches and seizures. It is the contention of counsel for the state that only unreasonable searches and seizures were prohibited, and that if there is probable cause for search and seizure, then the search and seizure is reasonable. But, how can the existence of "probable cause" alone make the search and seizure reasonable? What becomes of the requirement "supported by oath or affirmation," and the "warrant," and "specially designating" etc? A search within the meaning of the Constitution is unreasonable unless all the requirements set forth in the Constitution are complied with. In this case now before this court, the search and seizure was made by policemen without any warrant of

any kind whatever.  See *State* v. *Kees*, 27 A. L. R. 681, 114 S. E. (W. Va.) 617.

"In order to fully comprehend the full, true import and meaning of the restriction of the provision in the Constitution, it is necessary to follow the course of history with reference to searches and seizures in England and the American colonies, and the evils practised and the efforts made to curb unbridled police action until such efforts crystallized in the provisions in American Constitutions limiting power under warrants, or under legslative authority, or assumed police power, to make searches and seizures."  WIEST, J., dissenting, *People* v. *Case*, 27 A. L. R. 686, 220 Mich. 379, 190 N. W. 289; *State* v. *Marxhausen*, 3 A. L. R. 1505, 171 (Mich.) N. W. 557; *State* v. *Peterson*, 13 A. L. R. 1284, 194 (Wyo.) Pac. 342.

In this case now before the court the search and seizure cannot be justified on the ground that it was incident to a lawful arrest.  None of the grounds for arrest without warrant, set forth in the brief for the state apply here, because this case is not a felony, and not an indictable offense committed, not a breach of the peace threatened in the presence of an officer, within the meaning of the law.  The officer did not see or smell the liquor or know it was there by the exercise of his senses.  It was only by the illegal search that the offense was discovered.  This case is a misdemeanor only.

Counsel for the state attempts to justify the search and seizure on the ground that probable cause existed.  If probable cause alone is sufficient to justify search and seizure without warrant, no distinction can be made between the search of an automobile and the search of houses.  The same probable cause can exist with reference to one as to the other; there can be no distinction.  If automobiles can be searched upon probable cause, without a warrant, then persons and houses can equally be searched.  The Constitution makes no distinction.  It

covers persons, houses and possessions. *Falkner* v. *State,* 98 So. 691.

Some of the cases cited by counsel for the state seem to indicate that the word "unreasonable" in search and seizure refers to the manner in which the search is made. If the conduct of the officer is making the search is to determine whether the search is reasonable or unreasonable, then the search of persons and houses as well as automobiles can be made whenever his conduct is considered reasonable.

There is and can be no distinction between the search of automobiles on the one hand and of persons and houses on the other, if by reasonable search is meant either the existence of probable cause or the manner in which the search is made. The Constitution applies to all alike.

What then does "unreasonable" mean as used in our Constitution? "It ought not to be necessary to recall the fact that it is the essence of a free government that the individual shall be secure in his person, his home, and his property from unlawful invasion, from unlawful search, from unlawful seizure. The writing of these provisions into the Federal Constitution, into every Constitution of every state in the Union, was not an idle ceremony. With a clearness of vision our forefathers provided for a lawful search and seizure, one supported by oath or affirmation, describing the place to be searched and the person or things to be seized, and in the same section safeguarded the rights of the individual by inhibiting unreasonable and unlawful search. They provided an orderly manner for search and seizure, and prohibited all others." *State* v. *Marxhausen,* 3 A. L. R. 1507, 171 (Mich.) N. W. 557.

II. Assuming that the search and seizure in this case now before the court was unlawful, the other remaining question presented is whether the evidence so obtained was admissible or inadmissible. This question

involves the constitutional provision discussed above, section 23, against unreasonable search and seizure, and in addition section 26 of the Constitution against compelling a person to give evidence against himself. These two provisions must be interpreted together.

In support of the proposition that the evidence secured by unlawful search and seizure is inadmissible, there is a long line of decisions. First and foremost as authority in this state is the decision of this court in the case of *Tucker* v. *State*, 128 Miss. 211, 90 So. 845, and the following cases decided by this court subsequently: *Hill* v. *State*, 129 Mass. 445, 92 So. 578; *Williams* v. *State*, 129 Miss. 469, 92 So. 584; *Butler* v. *State*, 129 Miss. 778, 93 So. 3 (Automobile); *Taylor* v. *State*, 129 Miss. 815, 93 So. 355; *State* v. *Patterson*, 95 So. 96; *Owens* v. *State*, 98 So. 233; *Smith* v. *State*, 98 So. 344; *Regnall* v. *State*, 98 So. 444; *Taylor* v. *State*, 98 So. 459; *Falkner* v. *State, supra; City of Jackson* v. *Howard*, 99 So. 497; *Vaughn* v. *State*, 101 So. 439 (Automobile).

Next in line of importance are the following cases decided by the supreme court of the United States: *Boyd* v. *U. S.*, 116 U. S. 616, 29 L. Ed. 746; *Weeks* v. *U. S.*, 232 U. S. 383, 58 L. Ed. 652; *Silverthorn Lbr. Co.* v. *U. S.*, 251 U. S. 385, 64 L. Ed. 319; *Gouled* v. *U. S.*, 255 U. S. 298, 65 L. Ed. 649; *Amos* v. *U. S.*, 255 U. S. 313, 65 L. Ed. 654; *Re Jackson*, 24 L. Ed. 877.

In addition, there is a long list of authorities on page 1417 in a note in 25 A. L. R. 1408, under the statement that: "There are numerous modern cases holding that evidence obtained by an illegal search and seizure by the government is not admissible against the accused in a criminal case."

The following are some very late cases on the subject: *Batts* v. *State* (Ind. 1924), 144 N. E. 23; in which an automobile was stopped and searched without warrant and liquor found and the occupant arrested. The court held that unlawful search for liquor does not became lawful because liquor is found, and that the evidence thus se-

cured is inadmissible. *Callender* v. *State* (Ind. 1923), 138 N. E. 817; search for liquor under invalid search warrant, evidence inadmissible. *Ash* v. *Commonwealth* (Ky. 1922), 236 S. E. 1032; evidence in regard to liquor found by unlawful search inadmissible. *Simmons* v. *Commonwealth* (Ky. 1924), 262 S. W. 972; evidence secured by illegal search incompetent. *Adkins* v. *Commonwealth* (Ky. 1923), 259 S. W. 32; officer stopped and searched automobile without search warrant and found liquor, evidence incompetent. *Hilton* v. *Commonwealth,* 243 S. W. 918; officer had no right to stop and search for liquor without warrant, evidence incompetent. *State ex rel. Sadler* v. *Dist. Court, etc.* (Mont. 1924), 225 Pac. 100; liquor found in grip by unlawful arrest, evidence incompetent. *Thomas* v. *State* (Okla. 1923), 220 Pac. 976; evidence of liquor obtained by unlawful search inadmissible. *State* v. *Warfield* (Wis. 1924), 198 N. W. 854; evidence of liquor found by unlawful arrest inadmissible. See, also, *U. S. Fidelity & Guaranty Co.* v. *State to use of Hardy,* 121 Miss. 369, 83 So. 610; in regard to unlawful search of suitcase without warrant.

The finest discussions that I have found by the courts on this subject, outside of the cases of this court and of the United States supreme court, are found in the cases immediately following. I earnestly commend them to this court for its careful consideration. They are *State* v. *Marxhausen, supra; State* v. *Peterson, supra; Youman* v. *Commonwealth,* 189 Ky. 152, 224 S. W. 860, 13 A. L. R. 1303; *State* v. *Wills,* 91 W. Va. 659, 114 S. E. 261, 24 A. L. R. 1398; *Hoyer* v. *State* (Wis.), 193 N. W. 89, 27 A. L. R. 673; *People* v. *Castree,* 311 Ill. 392, 143 N. E. 112, 32 A. L. R. 357; *State* v. *Owens* (Mo.), 259 S. W. 100, 32 A. L. R. 383; *State* v. *Kees, supra;* Opinion of Weist, J., dissenting in *State* v. *Case* (Mich.), *supra.*

If policemen, constables, marshals and other officers could stop and search automobiles, the harm done would be far greater than the good. Many citizens of this state, perfectly innocent, would be stopped and searched, em-

barrassed and humiliated. There would be resistance and serious trouble. The people could not know their rights. If they were stopped, often they would not know whether it was an officer or not. If it was he would have no warrant to show, and they could not tell. If they resisted, they would be resisting an officer, though not knowing it. . If in fact it was not an officer, but some one intending to hold them up but pretending to be an officer, they still would not know. If they submitted, they might be robbed, if they resisted they might be injured, for such characters are always armed. It would be a very bad state of affairs and should be avoided.

According to the traditions of the common-law, it is better for ninety-nine guilty persons to escape punishment than for one innocent man to suffer. Would it not be better for some contraband cars to escape than for many innocent persons to be stopped, searched, humiliated and disgraced? I hope the court does not think that the innocent would not be stopped and searched. They would be reasonably safe where they are known, but away from home, in the little towns and rural districts it would be different.

I submit it would be better by far to cling to the doctrine of the Tucker case and let the rights of the people under the Constitution remain secure, than to try to make an exception where none can be made.

I respectfully submit that this case now before this court should be reversed and the appellant discharged.

*F. S. Harmon,* Assistant Attorney-General, for the state.

I. The presumption to be accorded a statute solemnly enacted by a co-ordinate branch of the government—that it be respected unless transgression of the Constitution is shown beyond a rational doubt—sustains this law. American Doctrine of Constitutional Law, 7 Harvard Law Review at 144; *State* v. *Henry* (1905), 87 Miss. 143,

40 So. 152; *Hart* v. *State* (1905), 87 Miss. 176, 39 So. 523; *Natchez R. R. Co.* v. *Crawford* (1911), 55 So. 598; Cooley's Constitutional Limitations (7 Ed.) pp. 252, 253 and 254; *Ex Parte Wren,* 63 Miss. 532; *State ex rel Attorney-General* v. *Jones* (1914), 64 So. 469; *University of Mississippi* v. *Waugh* (1913), 105 Miss. 627, 62 So. 827; *Johnson* v. *Reeves* (1916), 112 Miss. 230, 72 So. 925; *Hinds County et al.* v. *Johnson* (1923), 133 Miss. 591, 98 So. 95.

So much for the expressions of our own court. Hundreds of cogent statements from the courts of other jurisdictions reaffirm the rule. Mr. Justice CHASE in *Ware* v. *Hylton* (1796), 3 Dall. 171; *Cooper* v. *Telfair* (1800), 4 Dall. 14, per Mr. Justice PATTERSON; The Dartmouth College· Case in 1819; per MARSHALL, C. J.; *Ogden* v. *Saunders* (1827), 12 Wheat. 213, per Mr. Justice WASHINGTON; *Sinking Fund Cases* (1878), 99 U. S. 700, per Chief Justice WAITE; *People* v. *The Supervisors of Orange* (1858), 17 N. Y. 235.

II. Similar statutes in other states have been upheld. The provisions of sections 23 and 26 of the Mississippi Constitution find their counterpart not only in the Fourth and Fifth Amendments but in the Constitutions of prac· tically all the other states of the Union. With consti- ·tutional provisions identical or very similar, and with the same problems growing out of the use of highpowered motor cars by violators of the prohibition laws, it is interesting to find that other states of the Union have placed on the statute books laws similar to the act here under attack and the decisions upholding the constitutionality of these statutes are authorities of primary importance in the consideration of this case.

Ohio: General Code, sec. 6212-43. This act was upheld in *Houck* v. *State* (1922), 106 Ohio 112, 140 N. E. 112.

Virginia: Ch. 345, Acts 1920, sec. 4. Upheld in *Quivers* v. *Commonwealth* (Va.) 1923, 115 S. W. 564. This statute was again considered in *McClannan* v. *Chaplain,*

*et al.* (Va. 1923), 116 S. E. 495. See, also, *Hall* v. *Commonwealth* (Va. 1924), 121 S. E. 154; where the court again upholds the search and seizure act of 1920 and declares that it is not violative of the constitutional provisions against unreasonable search and seizure, or against self-incrimination.

Colorado: Ch. 141, Laws of 1919, sec. 13. This act was favorably passed upon by the supreme court of Colorado in *Sullivitch* v. *People* (1922), 206 Pac. 789. See, also, *Pasch* v. *People* (1922), 209 Pac. 639, where the court construed section 7 of the same statute, abolishing property interests in intoxicating liquors and admitted liquor, alleged to have been illegally seized, as evidence.

Pennsylvania: The Prohibition Enforcement Act of 1924, Public Laws 34, sec. 9. This statute has not been construed by the supreme court of Pennsylvania, but it was upheld in a well-reasoned opinion by the court of Quarter Sessions of Philadelphia County in *Commonwealth* v. *Street, District and County Reports,* (The Legal Intelligencer, Vol. 80, No. 50, p. 783, Dec. 18, 1923).

Vermont: Ch. 204, Acts of 1921, sec. 8, amending sec. 6539 of the General Laws. *State* v. *Four Jugs of Intoxicating Liquor,* 2 Atl. 586 (1886), sec. 2 of statute No. 43, Acts of 1882 was upheld.

Texas: Ch. 117, Acts 38th Regular Legislative Session, sect. 1. *Austin* v. *State* (1924), 261 S. W. 1035.

Maine: Sec. 28, ch. 127, Revised Statutes of Maine, as amended by ch. 167, Public Laws of 1923. The latest decision of the supreme court of Maine with respect to seizing liquor from an automobile without a warrant as provided by this statute is *State* v. *Chorosky* (1923), 122 Me. 238, where liquor was seized by an officer from an automobile which the officer searched without warrant.

New Jersey: Ch. 103, Laws of 1921, known as the Prohibition Enforcement Act of New Jersey, is most

elaborate in its provisions, the ninety-three sections of the Act covering every conceivable phase of this difficult and perplexing question. Section 23 subjects liquor and vehicles used in connection with its transportation to seizure, forfeiture and confiscation. Section 25 deals directly with our specific point. The New Jersey statute was upheld in an elaborate opinion rendered by the supreme court of New Jersey in *Katz* v. *Eldridge* (1921), 118 Atl. 242. We submit that this decision is a direct authority in favor of the state's contention here. Nor is the weight of the decision materially lessened by virtue of the fact that the court of errors and appeals reversed the case in 117 Atl. 841, on an entirely different point with respect to another section depriving the defendants the right of trial by jury.

North Carolina: Public Laws of 1923, ch. 1, sec. 6. This statute was upheld in the very recent case of *State* v. *Godette* (1924), 125 S. E. 25.

Federal Statutes: Statutes in nine different states have been set out and decisions construing them have been discussed. The statutes vary in language, but all achieve the same purpose sought to be attained by the Mississippi statute here under attack. If the courts of these other states could sustain these various statutes in the light of their constitutional provisions on the subject of search and seizure, it is submitted that the supreme court of Mississippi can do likewise without doing violence to our organic law. In fact it would be difficult to find a statute which holds officers of the law to closer limits than section 2 of this act. The language is such that the officer is never protected unless he acts upon probable cause as determined after the event by the same justice of the peace or circuit judge who is authorized before the event to issue a warrant authorizing the search.

Not a single statute has been held unconstitutional as far as our information and study goes.

Furthermore, there are a series of Federal Statutes passed by Congress over several decades which are no more drastic in their provisions than this law, and at-. tention is called to these acts of Congress, and decisions construing them.

(1)   Revised Statutes, sec. 2140, for the Protection of the Indians in the Indian country.   It will be noted that this statute authorizes Indian agents to search boats, wagons, and other vehicles and to seize them and liquor found therein, and this statute has been held constitutional.   For a discussion of this legislation see *U. S.* v. *One Buick Roadster* (1917), 244 Fed. 961.

(2)   Revised Statutes, sec. 3061, (Com. St., sec. 5763) dealing with the collection of customs duties and the enforcement of the customs laws.   This act was passed in 1866 and has been repeatedly upheld.   Be it noted that the officers may search and examine these vehicles when they "shall suspect there is merchandise subject to duty." See *U. S.* v. *Rembert* (1922), 284 Fed. 1004, and the cases therein cited.

(3)   Section 26, Title 2, of the National Prohibition Act of 1919 (The Volstead Act, Comp. St., Ann. Supp. 1923, par. 10,138½mm).   It will be noted that the Volstead Act authorizes a seizure of liquor when any officer of the law "shall discover any person in the act of transporting."   That phrase "shall discover" has been variously construed by the different federal courts. *Park* v. *U. S.* (1924, C. C. A. 1st Circuit), 294 Fed. 783.

Various cases upholding this provision of the Volstead Act in the various circuit courts of appeal are included in the list of authorities cited and discussed herein. The supreme court of the United States has not yet passed directly upon the constitutionality of this section.   But the fact that seven of the nine circuit courts of appeal in which cases have been found, have upheld a search and seizure without a warrant on facts similar to the case at bar, affords a strong indication of the

course that the supreme court of the United States will follow.

At the threshold of this case, therefore, we find not only a presumption in favor of the constitutionality of this act of a co-ordinate department of the government, but in addition thereto, we find that statutes of similar import varying in language, but similar in requiring the officer to act upon probable cause, have been upheld in at least nine states of the Union, as well as Acts of Congress, relative to enforcement of the customs laws, Indian affairs, and Prohibition.

But aside from the presumption in favor of constitutionality, aside from the legislative action taken in other jurisdictions, it is necessary and proper that our own constitutional provision be closely examined and the straight edge of the Constitution be applied to the particular statute here under attack in the light of logic and of reason and of legal history. At the outset of the discussion we are met with the statement that only unreasonable searches and seizures are prohibited.

III. Only unreasonable searches and seizures are prohibited. Section 23 of the Mississippi Constitution of 1890 is very nearly identical with the Fourth Amendment to the Federal Constitution and finds its parallel in a similar constitutional guarantee in the organic law of every state of the Union, save New York.

We are here concerned with the Fourth and Fifth Amendments to the Federal Constitution only in so far as the history of their adoption throws light on the evils which the patriots of the Revolutionary epoch sought to guard against.

It is well settled that the first Ten Amendments comprising the Federal Bill of Rights, have no application to the states and accordingly no question thereunder is raised on this appeal. *Brown* v. *New Jersey*, 175 U. S. 174, 44 L. Ed. 119; *Ensign* v. *Pennsylvania*, 227 U. S. 592, 57 L. Ed. 658; *Weeks* v. *U. S.*, 232 U. S. 383.

It is clear, however, that our constitutional guarantee against unreasonable search and seizure which has come down through the various constitutional conventions in the history of the state breathes the spirit of the Fourth Amendment. Just as the Fourth Amendment sought to protect the individual against unreasonable search and seizure of his person, his houses, his papers and effects at the hands of Federal officers, so section 23 seeks to protect the citizen of Mississippi against unreasonable search and seizure under authority of the state. While recognizing the inapplicability of the Fourth and Fifth Amendments in the actual decision of this case, counsel on the other hand, recognizes the transcendent importance of a correct understanding of their history and the circumstances resulting in their adoption in order to explain correctly the intent of the framers of our own organic law in incorporating a provision almost identical in our own charter of liberties.

(a) The colonial struggle was against "general writs of assistance." The student looks in vain for statements that any and all searches and seizures without warrants were in contravention of the liberties of a free people. The abuse was the issuance of the general search warrant or "writ of assistance." The constitutional prohibition was an effort to build up a safeguard against this specific abuse and any other abuse which made the search or seizure unreasonable. The slightest study of the history of this time will reveal the accuracy of the distinction here made and a failure of some courts to catch this distinction is responsible for much of the confusion which has arisen within the past generation.

There are two separate and distinct safeguards in the Fourth Amendment. The first clause then is a general prohibition, the second a specific safeguard, and the conclusion of these courts is neither logically accurate nor historically correct when they say that every search not made pursuant to a warrant such as here provided

for, is, an unreasonable search, regardless of the circumstances under which it is made.

(b) The struggle in England was likewise against general warrants. It is insisted, in some quarters that cases decided in England during the same period between the forces of tyranny and of liberalism sustain the contention that all searches and seizures without a warrant are illegal.

It is insisted for the state that the most casual reading of these cases will show that identically the same distinction was drawn by Lord Camden and his confreres, as was drawn in this country, in the struggle against these general search warrants. *Money* v. *Leach,* 3 Burrows 1742; the *Wilkes Case* (1763), 19 How. St. Tr. 982 at 1381; May's Constitutional History of England, ch. 11; *Entick* v. *Carrington* (1765), 19 How. St. Tr. 1029.

Here again, therefore, the most important cases of the Revolutionary Epoch in England shows a recognition of the distinction which counsel now seeks to press upon this court.

(c) The authorities sustain the contention, that a search and seizure is not unreasonable simply because made without a warrant. It is interesting to note that the reasonableness of a search for liquor without warrant in these automobile cases, such as the one at bar, has made a very strong impression on the Federal district and circuit courts of appeal. *Milam* v. *U. S.* (1924, C. C. A. 4th Circuit), 296 Fed. 631; *U. S.* v. *McBride* (1922, Ala. Dist. Court), 287 Fed. 216, where officers searched McBride's stable without a search warrant and found a still and liquor; *Lambert* v. *U. S.* (1922, C. C. A. 9th Circuit), 282 Fed. 417, a case directly in point.

Another case directly in point is *U. S.* v. *Bateman* (1922, Cal. Dist. Court), 278 Fed. 231. Here the specific question was whether a prohibition enforcement officer could stop an automobile on a public highway and search it for intoxicating liquors, without the consent of the driver and without any search warrant. The court re-

ferred to section 26 of the Volstead Act, authorizing an officer to seize a vehicle when he should discover liquor therein without a warrant, and stated that while Congress could of course, prohibit searches which were reasonable, Congress could not authorize searches that were unreasonable. See, to the same effect, *Haywood* v. *U. S.* (1920, C. C. A. 7th Circuit), 268 Fed. 803; *O'Connor* v. *U. S.* (1922, N. J. Dist. Ct.), 281 Fed. 398; see, also, 3 Wigmore on Evidence, sec. 2264, p. 3126.

(d)   The reasonableness of the search and seizure and not the presence or absence of a warrant is the test laid down by the Constitution. In dealing with the great constitutional guarantees such as that against "unreasonable searches and seizures" we need always to keep in mind Chief Justice MARSHALL's great major premise that "it is a Constitution we are expounding," and not a detached document inviting scholastic dialectics. Mr. Justice HOLMES has emphasized this point of view with the assertion that "the provisions of the Constitution are not mathematical formulas; they are organic, living institutions."

Instead of a rule we have here a standard by which the facts of each individual case must be measured. If the facts show that the search and seizure was reasonable, then the presence or absence of a warrant is immaterial; if the facts show that the search was unreasonable, then the presence of a warrant does not protect the officer in question.

(e)   The true test of reasonableness in this case is not the existence of a search warrant, but the existence of probable cause. *Wheeler* v. *Nesbitt,* 24 How. (U. S.) 544; *Carl* v. *Ayers,* 53 N. Y. 14; *Munns* v. *Dupont,* 3 Wash. C. C. Reports. Now our contention here is, that there must be the same degree of probable cause to justify a search without a warrant as would justify the issuance of a warrant. But the mere fact that the justice of the peace or judge ascertains after rather than before the

search, that probable cause exists makes no material difference, so long as it is found actually to exist.

In the case at bar, the special bill of exceptions shows affirmatively the existence of facts which enabled the officer to testify under oath that he had reason to believe and did believe, that intoxicating liquor was being transported by this particular defendant in the particular automobile seized; that he was transporting it over a particular road and in a particular direction. All of this is sworn testimony as is also the statement that the search was conducted without violence. From these facts, from this sworn testimony of the officer, the trial judge was just as able to find judicially that probable cause existed, justifying this search, as if this officer had made oath before him prior to the search and secured a warrant under which to act. In admitting the evidence therefore, the trial judge found affirmatively that the search was reasonable; that probable cause did exist; that no violence or undue force was used and that the evidence was therefore properly admissible. It would be an artificial distinction to hold that all this evidence was to be excluded because probable cause was not judicially found to exist before the search. The rights of the citizen have been equally well protected. The rights of the state have been safeguarded. The constitutional guarantee against unreasonable searches and seizures has not been abused. In the light of the facts of this case—in the light of the history of this section of our bill of rights, it is insisted that the distinction here made is a valid one.

IV. The constitutional prohibition against "unreasonable search and seizure" was not violated in this case, since the liquor seized was contraband and appellant's possession of same was unlawful. Section 5, chapter 189, Laws of 1918; see discussion of forfeiture in 4 Bacon's Abridgment, pp. 337-352; Chitty on Criminal Law, pp. 727-737. In *Goldsmith Grant Co. v. U. S.*

(1921), 254 U. S. 505, 65 L. Ed. 376; an Act of Congress passed July 13, 1866, 14 Stat. L. 151, ch. 184, par. 14, was under attack. In a similar case, *U. S.* v. *One Hundred Barrels Distilled Spirits* (1871), 14 Wal. 44, 81 U. S. 345, distilled spirits upon which the tax had not been paid at the time of a removal to a bonded warehouse and which afterwards came into the hands of a *bona-fide* purchaser for value without notice, were declared forfeited.

It is, therefore, of greatest importance to remember that the supreme court of the United States has held in a series of decisions not only that a statute providing for forfeiture of liquor upon which a tax has not been paid, is constitutional but that the forfeiture relates back to the very instant when the prohibited act was committed and from that moment the title to the contraband property vests in the United States.

The final link in the chain was established by Mr. Justice STORY in *Taylor* v. *U. S.* (1845), 3 How. 197, at 205, 11 L. Ed. 559, where under the Duty Collection Act of 1799 it was agreed that certain goods were seized by the wrong officer for failure to pay customs duty.

The three cases last cited, therefore, show that the irregularity of the seizure is immaterial; that when contraband is seized the forfeiture relates back to the time of the commission of the crime; and that the crime is committed the instant the goods come into the hands of the accused in violation of law.

This doctrine, if applicable to the case where a mere tax on liquor has not been paid under the revenue laws is certainly here applicable to a case where, under its far reaching police powers, the government speaking through the legislature has solemnly abolished all property rights in the prohibited liquors and has made the mere possession of such liquor a crime.

Our position is fully sustained by a cloud of authorities, both Federal and state to which the attention of the court is now called. *U. S.* v. *Stowell*, 133 U. S. 16, 33

L. Ed. 555; *U. S.* v. *Fenton* (1920, Mont. Dist. Ct.), 268
Fed. 221; *O'Conner* v. *U. S.* (1922, N. J. Dist. Ct.), 281
Fed. 396; *U. S.* v. *Rembert* (1922, Tex. Dist. Ct.), 282
Fed. 996.

It thus appears that the Federal courts fully recog-
nize the principle that where the goods seized are con-
traband, the right to their possession is in the govern-
ment and since the defendant has them in his possession
unlawfully, they may be recovered by force without a
warrant by the government officers.

Cases in many of the state courts are in accord. Opin-
ion of Judge SYKES in *Owens* v. *State* (1923), 133 Miss.
774; *Rosanski* v. *State* (1922), 106 Ohio 442; *Hall* v.
*Commonwealth* (Va. 1924), 131 S. E. 155; *State* v. *Sim-
mons* (N. C. 1922), 110 S. E. 595; *Commonwealth* v. *Dana*
(Mass. 1841), 2 Met. 337; *State* v. *Chuchola* (Del. 1922),
120 Atl. 214; *People* v. *Kamhout* (Mich. 1924), 198 N. W.
836.

The Constitution protects the defendant Donovan
Moore in his person, his property, and his possessions
against unreasonable search and seizure. Here the stuff
seized was contraband liquor to which he had no prop-
erty right in the eye of the law and no right of lawful
possession. His car was likewise, in the eye of the
law, forfeited to the state from the moment of the com-
mission of the first illegal act, to-wit: the transporta-
tion of the contraband therein.

Granted, therefore, that the strained and narrow con-
struction which appellant seeks to place on the meaning
of the words of section 23 be correct, this is not a proper
case for the constitutional guarantee, as so construed,
to be applied, since no property or lawful possessions
of this defendant were either searched for or seized.

V. The search of defendant's automobile and the
seizure of this contraband liquor was not unreasonable
since it did not compel the defendant to give evidence
against himself in violation of section 26 of the State

Constitution. Baldly stated, the position seems to be here taken that the admission of evidence secured as a result of a search without a warrant is compelling a man to give evidence against himself. With the greatest deference and respect, counsel insists that such a position is absolutely untenable, in the light of legal history.

A careful reading of the elaborate and scholarly exposition of the separate histories of the Fourth and Fifth Amendments by Prof. Wigmore, in his work on Evidence (3 Wigmore on Evidence, sec. 2264), and his article on "The Privilege against Self-Crimination," in 15 Harvard Law Review, 610, should prove to be absolutely convincing as answer to Mr. Justice Bradley's statement in *Boyd* v. *U. S.*

The doctrines crystallized in the two amendments are quite separate and distinct. They grew up at different times, for different reasons, and under different conditions. They are complementary rather than supplementary.

A classic statement of the separate histories of the prohibitions against unreasonable search and seizure and against self incrimination, is found in the opinion of Judge BAKER in *Haywood et al.* v. *U. S.* (1920, C. C. A. 7th Circuit), 268 Fed. 802.

The privilege against self-crimination is a privilege against testimonial compulsion and not against the use either of documents or of contraband chattels which are obtained from the person's control, without process to be used against him as a witness.

In the case at bar, when Chief of Police Simmons stopped this automobile, searched it, and discovered this contraband liquor, the evidence which he gave upon the trial was his evidence and not the evidence of Donovan Moore. There was no testimonial compulsion by virtue of which this appellant was forced to give evidence against himself. The words were the words of Simmons; the information was the information of Simmons; the

liquor was the property of the state, forfeited to it from the instant of the doing of the prohibited act.

That we are correct in this contention is seen by another reference to *Burdeau* v. *McDonald* (1921), 256 U. S. 475, where the supreme court of the United States, in a case already elaborately discussed herein, held that—"The Fifth Amendment, as its terms import is intended to secure the citizen from compulsory testimony against himself. It protects from extorted confessions or examination in court proceedings by compulsory methods."

Donovan Moore, in the case at bar, did not perform a single affirmative act and in the absence of such affirmative action and in the absence of force compelling him to testify or to produce documents at the trial, how can it be said that there is any element of self-incrimination in this case? It seems clear, therefore, that chattels obtained from a person's control, without the use of process, are not within the scope of the privilege and may be used as evidence; and a cloud of authorities cited in 3 Wigmore on Evidence, par. 2264, p. 3124, Note 2, sustains our position. *Argetakis* v. *State* (Ariz. 1923), 212 Pac. 372; *State* v. *Reynolds* (Conn. 1924), 125 Atl. 639; *People* v. *Mayen,* (Cal. 1922), 205 Pac. 442; *State* v. *Barela* (N. M. 1917), 168 Pac. 547; *Holt* v. *U. S.,* 281 U. S. 245, 31 Sup. Ct. Rep. 2, 54 L. Ed. 1031, 20 Ann. Cas. 1138.

We are well satisfied, however, to rest upon the decisions of the supreme court of Mississippi in cases not cited in the argument of *Tucker* v. *State,* and not mentioned by the court in that decision. These cases, not having been overruled by a majority of the judges of the full court, remain to this day as the clear cut pronouncement of the law on this point in this state. *Magee* v. *State* (1908), 92 Miss. 865, 46 So. 529; *Pringle* v. *State,* (1914), 108 Miss. 802, 67 So. 455.

VI. Section 2 of the statute under attack is not unconstitutional in authorizing the arrest without a war-

rant of a person whom the officer has reasonable ground to believe has committed or is committing a felony, since the arrest under such circumstances without a warrant was good at common law at the time of the adoption of the constitution; and a search and seizure conducted as an incident to such arrest is not an unreasonable search or seizure. The special bill of exceptions in this case states that after the Chief of Police secured the information as to the approach of appellant's car, the Chief of Police proceeded to the Pearl River Bridge and that presently the automobile described to the Police Chief and bearing the tag number given him, crossed the bridge and ''at that place the witness arrested the defendant Donovan Moore and searched the automobile that he was driving and found several quarts of whiskey.''

It thus appears from the bill of exceptions that this officer arrested the defendant Donovan Moore on the basis of information which he had previously secured that Donovan Moore had committed and was committing a felony, viz: That he had transported and was then continuing to transport intoxicating liquor contrary to law.

It is the state's position that the officer did no more in this case than he had a clear right to do in England, under the common law, decades prior to the separation of the colonies and the adoption of the various state Constitutions. And it is well settled that constitutional provisions are ''to be construed in conformity with the basic principles of the common law which were familiarly known to the framers of the Constitution. *Kansas* v. *Colorado* (1922), 206 U. S. 46 at 94-95, 51 L. Ed. 956, 281 Fed. 397; *U. S.* v. *Wong Kim Ark,* 169 U. S. 651, 42 L. Ed. 892; Mr. Story, on the Constitution (5 Ed.), par. 1902, p. 648.

We have had in the various codes of Mississippi for many years a statute which seems to reflect this common-law rule. So far as the writer has been able to ascertain, the constitutionality of this old statute has never been successfully assailed. Section 1204, Heming-

way's Code, the same being section 1447, Code of 1906, section 1375, Code of 1892, is entitled: "Arrests—When made without a warrant."

Furthermore, it can be demonstrated easily that this statute, section 1204, is merely a crystallization in codified form, of the ancient common-law doctrine of arrest. Blackstone in this Commentaries, Book 4, p. 292, states the common-law doctrine. *Green* v. *U. S.* (1923), 289 Fed. 238; *Ledwith* v. *Catchpole,* Cald. Cas. at 295; *Lawrence* v. *Hedger,* 3 Taunt. 14; *Beckwith* v. *Philby,* 6 Barn. & Cress. 635; *Pritchett et al.* v. *Sullivan* (1910, C. C. A. 8th Circuit), 182 Fed. 480. To the same effect see, *Park* v. *U. S.,* 294 Fed. 781; *O'Connor* v. *U. S.* (1922 N. J. Dist. Ct.), 281 Fed. 396; *People* v. *Kamhout* (Mich. 1924), 198 N. W. 836; *Hughes* v. *State* (Tenn. 1922), 238 S. W. 588.

The fact of the business is, that in regard to the arrest feature, the law of 1924 now assailed did nothing more than re-enact with specific reference to liquor violations what was already the statute law of this state and the common-law doctrine, with respect to arrests for all threatened violations of law, as set forth in the Code of 1892, in the section herein quoted. In view of the importance of the enforcement of the liquor law this feature was included in this statute specifically, though we are frank to say to the court, on the arrest feature that the law here involved conferred on this Chief of Police no authority to arrest not already possessed by him by virtue of section 1204, Hemingway's Code, which has come down from 1892.

This feature of the statute finds its exact parallel in section 26 of the Volstead Act which authorized Federal officers to arrest individuals under similar circumstances, search the vehicle which they are driving, and seize the contraband liquor so found. Furthermore, another close analogy is found in our statute authorizing the arrest of gamblers without a warrant, section 1212, Hemingway's Code, the same being section 1455, Code of 1906, sec. 1383, Code of 1892.

Briefly summarizing the state's position, we find a well-settled presumption favoring the constitutionality of an Act of the legislature; we find similar statutes upheld by the highest courts of other states in this Union; and it is urged that where probable cause is found to exist by justices of the peace or circuit judges for an arrest and a search, and where such arrest and search are conducted in a reasonable manner, that the absence of a warrant does not render said arrest, search, or seizure unreasonable, especially where the chattel searched for and seized and for the possession of which the individual is arrested, has been divested of all characteristics of property, and as contraband became forfeited to the Government from the instant the prohibited act was committed.

VII.  No constitutional provision was violated by the legislature in enacting section 3, chapter 244, Laws of 1924, changing the rule of evidence in liquor cases and bringing same into accord with the previously announced doctrine of the Mississippi court and the vast majority of the other common-law jurisdictions to the effect that evidence otherwise relevant and competent shall not be rendered inadmissible because illegally secured.  Section 3, to which attention is now called, is much broader than section 2 in one sense, and very much narrower in another.  It is broader in that it is not limited in its application to the case of vehicles, such as automobiles, in which liquor is being transported, but is so worded as to render admissible, evidence illegally secured in any and all liquor cases, whether the unauthorized search be a search of the home, premises, or the person.  On the other hand, section 3 is much narrower than section 2 in that it affords the officer no protection whatever, leaving him fully and completely liable for a search and seizure not made by virtue of a warrant or not made in the narrow class of cases covered by section 2.

In other words, the section now under discussion is simply a rule of evidence and in no wise affects any of the substantive rights of the parties. Any individual claiming to have been injured by an unauthorized act of an officer may still seek redress in the courts and no officer may plead section 3 by way of defense. The only change, therefore, which section 3 will bring about in our law is to render admissible certain evidence in liquor cases which an equally divided court has held inadmissible in such liquor cases but which a unanimous court has held to be admissible in other varieties of criminal actions.

Stated baldly, the situation is this: The supreme court of Mississippi decided *Pringle* v. *State,* 108 Miss. 806, 67 So. 455, in 1914. There a constable searched the clothing of the accused, then confined in jail awaiting trial, and seized a damaging letter which was admitted in evidence and constituted one of the strongest links in the chain of circumstances which led to the accused's conviction. The court cited with approval the leading case of *State* v. *Turner,* 82 Kan. 787, 109 Pac. 654, 32 L. R. A. (N. S.) 772, 136 Am. St. Rep. 129, and notes thereto.

In 1922, *Tucker* v. *State,* 128 Miss. 211, 90 So. 845, was decided by Division A and in the opinion it was announced as a rule of evidence, that evidence illegally secured in a liquor case was inadmissible. No reference whatever was made to *Pringle* v. *State,* nor is there anything to indicate that the attention of the court was called to this decision.

In December, 1923, *Owens* v. *State,* 133 Miss. 753, 98 So. 233, was decided by the court en banc, three judges adhering to the rule laid down in *Tucker* v. *State,* and three judges expressing views in conflict therewith. Since a majority of the court is required to overrule a decided case and since the court was evenly divided, the rule of evidence announced in *Tucker* v. *State,* as applicable to liquor cases, remained in force.

Exactly one month after the decision in *Owens* v. *State*, the legislature of Mississippi convened, and the difficulty in which the court found itself, with respect to this important rule of evidence, was brought to the attention of the judiciary committees of house and senate. The net result of the discussion was the introduction of Senate Bill No. 431 which was duly enacted and received the approval of the Governor on April 12, as chapter 244 of the Laws of 1924.

Section 3 of this Act is intended to be a solution of the perplexing problem of evidence. It is so worded as to apply only to liquor cases and bring the rule of evidence in these cases into harmony with the previously announced general rule of evidence promulgated by the court in the Pringle case. If this section is valid, then the legislature has secured uniformity in so far as the admission of illegally secured evidence is concerned, regardless of whether it be a whisky case or a murder case, for certainly the Pringle case has never been overruled, since the majority of the judges of this court have never made such a pronouncement. Certainly the Tucker case has not been overruled, since only three judges announced themselves in opposition to that doctrine.

The effort of the legislature was clearly a laudable one and in no sense, constitutes an interference with the activities of a co-ordinate department of the government. For it is well settled that the legislature has full power with respect to the making and alteration of the rules of evidence. The scope of its power in this regard is best pointed out by reference to decided cases. *Carothers* v. *Hurley* (1866), 41 Miss. 71; *Hopt* v. *Utah* (1884), 110 U. S. 574; *Thompson* v. *Missouri* (1897), 171 U. S. 380; Cooley on Constitutional Limitations, ch. 9, p. 272; *Mrous* v. *State* (Tex.), 21 S. W. 764; *Dunning* v. *West* (La. 1899), 25 So. 306; *Burke* v. *Putman* (Iowa 1901), 84 N. W. 1035; *Katz* v. *Eldredge* (N. J. 1921), 118 Atl. 247; *People* v. *Johnson* (N. Y. 1906), 77 N. E. 1164; *People* v. *Braun* (Ill. 1910), 92 N. E. 917.

The state insists, however, that the reasoning set forth in the above decisions is equally applicable here. Let us look at the logic of the matter and see in a common-sense way whether or not the state's contention is sound.

We have certain great fundamental constitutional guarantees protecting the citizen in the sanctity of his person, the untroubled possession of his property and the complete security of his home. Any person, be he officer or private individual, who lays impious hands upon my person commits a battery; and when my right to personal integrity is violated, the law substitutes for this primary right a secondary or remedial right, commonly called a right of action. When an officer or private individual, without authority, breaks into my home, disturbs my peace and quiet, and seizes chattels rightfully in my possession, my primary right in the security of my property and home has been violated by such unreasonable search and seizure. At the instant this primary right is violated, there springs into being, by operation of law, a secondary right, to-wit: the recovery by self-help, or court help, of the chattels seized and carried away, and a right of action against the trespasser, be he officer or private citizen. Nor is this all. When my right of action has been exercised, suit brought and a judgment secured, the law, in its effort to remedy the wrong done to my primary right, grants to me still another remedial one, to-wit: A right to have execution issue in satisfaction of the judgment.

So it is, that we find a well-settled and clear-cut distinction between the primary rights and the group of secondary or remedial rights which the law creates in my favor. Not a single one of these remedial rights is touched in any fashion by the statute here under attack. My primary right to the security of my home and person and chattels was destroyed the instant the illegal act was committed. All that the law can do is to furnish a remedy. This the law furnishes in the same

full measure that a remedy is furnished for the violation of other primary rights.

Where is the logic, therefore, of insisting that the exclusion of evidence illegally secured, furnishes an additional remedial right to me? Such a view is simply erroneous.

Briefly summarized, the state's position here is that the legislature has full control over rules of evidence; that the legislature may prescribe at what age a little child may be a competent witness; that the legislature may prescribe whether or not a felon may be competent to testify at all, that the legislature may make the wife competent to testify against her husband, and the husband competent to testify against the wife; and that the legislature may declare, as was done in the statute now under attack, that an officer of the law shall be competent to testify as to information secured through an unauthorized search and seizure, without in any wise limiting the right of the injured individual to sue for damages, or removing from the officer's head any criminal penalty for his unauthorized act. The rule laid down by the legislature is in accord with the previous announcements of this court and in line with the vast weight of authority in England and all other common-law jurisdictions, and meets with approval of all the text writers on evidence whose opinion on the point has been found.

Attention is called to the following summary of authorities favoring the views herein discussed, and a listing of the authorities by jurisdictions which are apparently contrary, with appropriate comments seeking to distinguish the cases *contra* from the case at bar.

(a) Decisions of thirty-five States are in accord.

1. ALABAMA. (1921). *Banks* v. *State,* 92 So. 293, 24 A. L. R. 1359.

2. ARIZONA. (1923). *Argetakis* v. *State,* 212 Pac. 372.

3. ARKANSAS. (1921). *Benson* v. *State,* 233 S. W. 758, 149 Ark. 633; (1923). *Venable* v. *State,* 246 S. W. 860.

4. CALIFORNIA. (1922). *People* v. *Mayen,* 205 Pac. 435.

5. COLORADO. (1922). *Sullivitch* v. *People,* 206 Pac. 789; (1922) *Pasch* v. *People,* 209 Pac. 640.

6. CONNECTICUT. (1924). *State* v. *Reynolds,* 125 Atl. 636.

7. DELAWARE. (1922). *State* v. *Chuchola,* 120 Atl. 212.

8. GEORGIA. (1923). *Johnson* v. *State,* 118 S. E. 702.

9. IDAHO. (1918). *State* v. *Anderson,* 174 Pac. 124; (1922) *State* v. *Myers et al.,* 211 Pac. 440.

10. IOWA. (1923). *State* v. *Tonn,* 191 N. W. 530.

11. KANSAS. (1910). *State* v. *Turner,* 109 Pac. 654, 32 L. R. A. (N. S.) 772 (leading case); (1918) *State* v. *Van Wormer,* 173 Pac. 1076.

12. LOUISIANA. (1923). *State* v. *Davis,* 97 So. 590.

13. MAINE. (1923). *State* v. *Chorosky,* 122 Me. 283.

14. MARYLAND. (1906). *Lawrence* v. *State,* 103 Md. 17, 63 Atl. 102.

15. MASSACHUSETTS. (1923). *Com.* v. *Wilkins,* 138 N. E. 11; (1841). *Com* v. *Dana,* 2 Met. 257.

16. MICHIGAN. (1924). *People* v. *Kamhout,* 198 N. W. 831.

17. MINNESOTA. (1923). *State* v. *Pluth,* 195 N. W. 789.

18. NEBRASKA. (1923). *Billings* v. *State,* 191 N. W. 721; (1924). *Bush* v. *State,* 199 N. W. 792; (1907). *Younger* v. *State,* 114 N. W. 170.

19. NEW HAMPSHIRE. (1919). *State* v. *Agalos,* 107 Atl. 314; (1858). *State* v. *Flynn,* 36 N. H. 64, (*Leading* Case.)

20. NEW JERSEY. (1921). *Katz* v. *Eldredge,* 118 Atl. 242; (1923). *State* v. *Gould,* 122 Atl. 596; (Nov. 1923). *State* v. *Lyons,* 122 Atl. 758.

21. NEW MEXICO. (1917). *State* v. *Barela,* 168 Pac. 545.

22. NEW YORK. (1922). *People* v. *Esposito,* 194 N. Y. Supp. 328; (1903). *People* v. *Adams,* 68 N. E. 636, 176 N. Y. 351; 63 L. R. A. 406, (Leading Case); Affirmed

by U. S. Supreme Court, (1904) 192 U. S. 585, 48 L. Ed. 575; (1922). *People* v. *Diamond,* 233 N. Y. 130.

23. NEVADA. (1924). *State* v. *Chin Gim,* 224 Pac. 798.

24. NORTH CAROLINA. (Oct. 1924). *State* v. *Godette,* 125 S. E. 24; (1922). *State* v. *Simmons,* 110 S. E. 591.

25. NORTH DAKOTA. (1924). *State* v. *Dinger,* 199 N. W. 196.

26. OHIO. (1922). *Houck* v. *State,* 106 Ohio 195; (1922). *Rosanski* v. *State,* 140 N. E. 370, 106 Ohio 444.

27. OREGON. (1924). *State* v. *Goldstein,* 224 Pac. 1087; (1916). *State* v. *Ware,* 154 Pac. 907.

28. PENNSYLVANIA. (1923). *Com.* v. *Street & Street,* (Quarter Sessions, Philadelphia County, Legal Intelligencer, Dec. 18, 1923, p. 783); (1922). *Com.* v. *Klein,* 81 Pa. Super Ct. 55.

29. SOUTH CAROLINA. (1923). *State* v. *Maes,* 120 S. E. 576.

30. SOUTH DAKOTA. (1922). *City of Sioux Falls* v. *Walser,* 187 N. W. 821.

31. TEXAS. (1924). *Austin* v. *State,* 261 S. W. 1035; (1924). *Delaney* v. *State,* 263 S. W. 1065; (Latest case, though leading case for this doctrine is *Rippey* v. *State,* (1920) 219 S. W. 463).

32. UTAH. (1923). *State* v. *Aime,* 220 Pac. 704.

33. VERMONT. (1905). *State* v. *Krinski,* 78 Vt. 162, 62 Atl. 37.

34. VIRGINIA. (1924). *Hall* v. *Com.,* 121 S. E. 154; (1923). *McClannan* v. *Chaplain,* 116 S. E. 495.

35. WASHINGTON. (1923). *State* v. *Basil,* 217 Pac. 720.

(b) Decisions of U. S. supreme court and circuit courts of appeal are in accord.

U. S. SUPREME COURT. (1904). *Adams* v. *New York,* 192 U. S. 575, 48 L. Ed. 585.

C. C. A. 1st CIRCUIT. (1924). *Park* v. *U. S.,* 294 Fed. 776.

C. C. A. 2d CIRCUIT. (1923). *Agnello* v. *U. S.,* 290 Fed. 671.

C. C. A. 4th CIRCUIT. (1924). *Ash* v. *U. S.*, 299 Fed. 277; (1924). Milan v. U. S., 296 Fed. 629; (1923). *Boyd* v. *U. S.*, 286 Fed. 930.

C. C. A. 5th CIRCUIT. (1922). *Bell* v. *U. S.*, 285 Fed. 145.

C. C. A. 7th CIRCUIT. (1920). *Haywood* v. *U. S.*, 268 Fed. 803.

C. C. A. 8th CIRCUIT. (1923). *Green* v. *U. S.*, 289 Fed. 236.

C. C. A. 9th CIRCUIT. (1922). *Lambert* v. *U. S.*, 282 Fed. 413.

(c)   Typical decisions of federal district courts support state's contentions.

N. D. CALIFORNIA. (1923). *U. S.* v. *Vatune*, 292 Fed. 497.

S. D. CALIFORNIA. (1922). *U. S.* v. *Bateman*, 278 Fed. 231.

MONTANA DISTRICT. (1920). *U. S.* v. *Fenton*, 268 Fed. 221.

S. D. ALABAMA. (1922). *U. S.* v. *McBride*, 287 Fed. 214.

E. D. MICHIGAN. (1923). *U. S.* v. *Daison*, 288 Fed. 199.

S. D. OHIO. 1922). *U. S.* v. *Hilsinger*, 284 Fed. 585.

(d)   England and Canada are in harmony.

(1723). *Bishop Atterbury's Trial*, 16 How. St. Tr. 495, 629.

(1740). *Jordan* v. *Lewis*, 2 Stra. 1122, 14 East 306 note.

(1811). *Legatt* v. *Tollervey*, 14 East, 302.

(1826). *R.* v. *Derrington*, 2 C. & P. 419.

(1886). *R.* v. *Doyle*, 12 Ont. 350.

(e)   Text writers all concur.

1 Bishop New Crim. Procedure, p. 148.

Greenleaf on Evidence, sec. 254a.

V. Jones on Evidence, par. 884.

Taylor on Evidence (9 Ed.), 922.

2 Wharton Crim. Evidence, par. 518g.

3 Wigmore, on Evidence, par. 2183, p. 2955.

(f)   Eleven jurisdictions apparently hold *contra*, though some of decisions are readily distinguishable.

1. FLORIDA.  (1921).  *Haile* v. *Gardner,* 91 So. 376.; (1924).  *Jackson* v. *State,* 99 So. 548.

2. ILLINOIS.  (1924).  *People* v. *Castree,* 145 N. E. 112.

3. INDIANA.  (1923).  *Flum* v. *State,* 141 N. E. 353; (1922).  *Callender* v. *State,* 136 N. E. 10.

4. KENTUCKY.  (1920).  *Youman* v. *Com.,* 224 S. W. 860; (1923).  *Davis* v. *Com.,* 256 S. W. 429; (1924).  *Cole* v. *Com.,* 257 S. W. 713.

5. MISSOURI.  (1924).  *State* v. *Owens,* 259 S. W. 100.

6. MONTANA.  (1924).  *State ex rel. King* v. *District Court,* 224 Pac. 862; (1921).  *State ex rel. Samlin* v. *District Court,* 198 Pac. 362; (1917).  *State* v. *Reed,* 163 Pac. 477.

7. OKLAHOMA.  (1923).  *Thomas* v. *State,* 220 Pac. 976.

8. TENNESSEE.  (1922).  *Hughes* v. *State,* 238 S. W. 588.

9. WEST VIRGINIA.  (1923).  *State* v. *Pridemore,* 116 S. E. 756.

10. WISCONSIN.  (1924).  *State* v. *Warfield,* 198 N. W. 854.

11. WYOMING.  (1920).  *State* v. *Peterson,* 194 Pac. 342.

VIII. *Conclusion.*  This question of searches and seizures is one of the main legal battle grounds of this decade.  The automobile and airplane have worked wondrous changes in every branch of human relationship. Properly used, they are boons of inestimable worth to the human race; in the hands of the lawless and the dissolute, they are tools of uncommon advantage and their use in the commission of crime has raised problems of infinite complexity.  To no class is the automobile more indispensable than to the rum-runner and the bootlegger. In no instance is it more necessary to the very existence of government that some efficient and · constitutional means be found to curb the flagrant and open violations of the Eighteenth Amendment.

That amendment is of the same force and effect as any other integral part of the Federal Constitution. Its full enforcement is a duty and a necessity. The effort of the state in this case is not to weaken the constitutional guarantees of the Fourth and Fifth Amendments as reflected in our own constitutional provisions but to strengthen the Eighteenth Amendment, for as part of "the supreme law of the land" it is equally binding upon us.

In closing this discussion, the court's attention is called to the fact that when our Revolutionary Ancestors formulated the provisions against unreasonable search and seizure, the Eighteenth Century doctrine of natural rights was uppermost in their minds. Samuel Adams, Patrick Henry, and George Mason were thinking of the individual's inalienable right to the integrity of his person, the sanctity of his home, and the protection of his possessions when they drew the pertinent provisions of the Massachusetts and Virginia Bill of Rights. These natural rights which were peculiarly the subject of protection against the despotism of organized society and of its official representatives, long antedated the promulgation of these constitutional provisions.

But the right to drive a complicated, highpowered and dangerous automobile over the highways of this state is not a natural right, on a par with that of the sanctity of the home or the integrity of the person. No man has a right to operate an automobile upon the highways of this state without a preliminary license granted by the state. No one needs such a license to inhabit a home, to walk down the streets with one's hands in one's own pockets or to accumulate ordinary chattels in one's own premises.

But when an individual seeks to embark upon certain callings and to conduct certain lines of busiess, he must secure a privilege license from the state and submit to inspection and regulation by the state. Similarly, in a crowded city the state steps in and says that one may not

keep a foul pig sty within the narrow confines of his own back yard and in close proximity to a crowded apartment house. In the same way, the state declares that a child of tender years, a drunk man or a person without any experience whatever, may not operate a motor car along its streets imperiling the lives of scores of citizens as well as the safety of property.

A policeman is warranted in stopping my car at any moment and requiring me to show a license to drive same over the highways of this state. Without a license and the tag which stands out as the state's public permission for my action, I have no right as an individual to operate one of these complicated machines on the highways. In other words, there is a vast distinction between the individual's interest in his person, his home, and his property, and his right to drive a car along a public road. If the state requires a license to run such a car, it is not unreasonable to allow the officers of the law to see whether the state's permission is being abused. A car loaded with nitroglycerin is not a safe vehicle to move along a crowded street. A car loaded down with contraband whiskey is in the same class. Surely in the light of these considerations, the state in order to protect its citizens is justified in solemnly enacting a law providing for a reasonable search of these vehicles when the law officer making the search has probable cause to believe that the Prohibition laws are being violated and the state's permission to operate the vehicle over its highways, is being grossly abused.

All these considerations weighed mightily with the legislature in the passage of this statute. They are submitted for the court's careful attention as showing the reasonableness of the legislature's action and the necessity for it.

The affirmance of this cause will not destroy precious constitutional guarantees which this court, as well as counsel, are quick to defend and safeguard. But this affirmance will strengthen the enforcement of the Eight-

eenth Amendment, promote law and order, aid in bringing flagrant violators of the law to justice, and enable the state to better protect its people. Its affirmance will deprive this appellant of no constitutional right. It will afford the people of Mississippi, acting in their sovereign capacity, an opportunity to better enforce the law and make of government that "contrivance of human wisdom" which Edmund Burke long ago insisted it should be "in providing for human wants." May we add in his words that "Men have the right that these wants should be provided for by this wisdom."

Argued orally by *Geo. L. Teat* and *Geo. S. Hamilton,* for appellant, and *Francis Harmon,* Assistant Attorney-General, for the state.

SMITH, C. J., delivered the opinion of the court.

This is an appeal from a conviction for having intoxicating liquor in possession. The conviction rests on testimony obtained by a search of the appellant's automobile without a warrant therefor. The bill of exceptions sets forth this testimony and the appellant's objection thereto as follows:

"Said Simmons, being duly sworn, testified as follows: That on the 24th day of April, 1924, he was called over the telephone by an officer of an adjoining county, who stated to him that an automobile containing whisky was making a rapid approach to the city of Jackson, and would pass into the city of Jackson over Pearl River Bridge, giving witness a description of the automobile and the tag number of the same; that Simmons at the time was chief of police of the city of Jackson, and having reason to believe, and then and there believing, that intoxicating liquor was thus being transported, at once repaired to the western end of said bridge, which is situated in the Fifth supervisors district of Hinds county, and within the corporate limits of the city of Jackson, Miss.,

and that presently approached over said bridge and into the city of Jackson the automobile described to said witness, and bearing the tag number given to him; that in said city and at that place the witness arrested the defendant, Donovan Moore, and searched the automobile that he was driving, and found several quarts of whisky; that the search was made without violence or the consent of the said Donovan Moore, who was driving and in possession of said car containing said intoxicating liquors; that in the telephone message above mentioned, the party giving him the information stated to him that the automobile contained and there was being transported in said automobile several quarts of intoxicating liquors; that he regarded the officer giving him the information as being a credible person, and that he believed the information given to be true, and acted upon the same in good faith, at the time when he made the search and found the defendant with the whisky. Whereupon the defendant objected to said testimony upon the ground that it involved a search, and that the information given in said testimony was obtained by testimony secured against the will of the defendant without affidavit or search warrant, and that the said search was in violation of the Constitution of the state of Mississippi, and that under the decisions of the supreme court of Mississippi said testimony was not competent to be introduced before the jury.''

Section 2, chapter 244, Laws of 1924, provides that—''It shall be the duty of any sheriff or constable of a county, or any sheriff, constable, marshal, or policeman in a municipality who has reason to believe and does believe that intoxicating liquor is being transported in violation of law, in any wagon, cart, buggy, automobile, motorcycle, motor truck, water or air craft, or any other vehicle, forthwith to make a reasonable search of such vehicle and to seize any intoxicating liquor so found being transported or being attempted to be transported in violation of law and at once to arrest the person or per-

sons in possession or control thereof and transporting or attempting to transport same in violation of law; and such officer or officers proceeding in good faith shall not be liable either civilly or criminally for such a search and seizure without a warrant, so long as said search and seizure is conducted in a reasonable manner, it appearing that the officer or officers had reason to believe and did believe that the prohibition laws of the state of Mississippi were being violated at the time such search was instituted. And the officer or officers making such search shall be a competent witness, or witnesses, to testify as to all facts ascertained, and discoveries made, by means of said reasonable search, and all liquor, and all appliances for its manufacture or transportation, so seized in the reasonable search of any such vehicle shall be admitted as evidence.

"But this section shall not in any event authorize the search of a residence or home or building or room in a building or premises, without a search warrant duly and properly issued."

The question presented for decision is the validity, *vel non,* of this statute under section 23 of the Mississippi Constitution, which provides that—"The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized."

The possession, transportation, and control of intoxicating liquor is a misdemeanor punishable by fine and imprisonment. Section 5, chapter 189, Laws of 1918, provides that no property rights of any kind shall exist in intoxicating liquor, and that all such liquor may "be seized by the sheriff or any other lawful officer of the state, and destroyed and rendered useless by him without any formal order of any court."

The section of the Mississippi Constitution here under consideration is practically a rescript of the Fourth

Amendment of the federal Constitution, and the supreme court of the United States has recently held that the provision of the National Prohibition Act (U. S. Comp. St. Ann. Supp. 1923, section 10138¼ *et seq.*) permitting vehicles, boats, etc., to be searched for intoxicating liquor without a warrant, on probable cause therefor, is valid. *Carroll* v. *United States,* 45 S. Ct. 280, 69 L. Ed. —, decided March 2, 1925, and not yet [officially] reported. While it is true that this decision of the supreme court of the United States is not binding on us, it is, to say the least, very persuasive, and, moreover, the enforcement of the amendment to the Federal Constitution prohibiting the manufacture and sale of intoxicating liquor will be more effectually enforced in Mississippi if the decisions of the state and Federal courts thereon are in accord.

Section 23 of the Constitution does not prohibit all searches and seizures, nor does it, in express terms, require a warrant therefor. It prohibits: First, unreasonable searches and seizures; and, second, the issuance of warrants "without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized."

The right of the citizen to be secure from unreasonable searches and seizures was a great constitutional doctrine of the common law (*Money* v. *Leach,* 3 Burr. 1742; *The Bishop of Atterbury's Case,* 16 Howell St. Tr. 490; *Entick* v. *Carrington,* 19 Howell St. Tr. 103; Story's Constitution, section 1902), and its incorporation into the national and the early state Constitutions was because of the claim of the English and of some of the colonial governments of the right "to issue warrants for the arrest of persons without inserting their names in the warrants, especially authors, printers and publishers of obscene and seditious libels, and to invade the homes and search for private papers of individuals to obtain evidence against them on imaginary charges" (2 Watson on Construction, pp. 1414, 1415; Cooley's Constitutional

Limitations [7th Ed.] 426; 4 Wigmore [2d Ed.] 2264). When the Constitution is viewed, as it must be, in the light of this historical fact, it is clear that the reasonableness of a search or seizure must also be viewed and determined in the light of the common-law traditions. *People* v. *Chiagles,* 237 N. Y. 193, 142 N. E. 583, 32 A. L. R. 676.

The immunity, it will be observed, covers not only a search and seizure of property, but of persons as well, and the common-law rules and statutes permitting and regulating arrests or seizures of persons are pertinent here, for a seizure of property cannot be said to be unreasonable if made under the same circumstances that justify the arrest or seizure of a person. An arrest at common law. has always been permissible without a warrant if made on probable cause therefor. For a misdemeanor when committed in the presence of the person making the arrest, and for a felony, though not committed in the presence of the person making the arrest on probable cause therefor.

If section 23 of the Constitution prohibits all arrests or seizures of persons without a warrant, the rule of the common law permitting such arrests or seizures is necessarily abrogated thereby; but such has not been the construction placed thereon by this or any other court in so far as we are aware, and the legislature has uniformly acted on the theory that arrests without a warrant are not prohibited by the Constitution.

Section 1447, Code of 1906, Hemingway's Code, section 1204, authorizing and regulating arrests without a warrant, enacts practically the common law on the subject and appeared in our statutes at least as early as the Code of 1857, see page 618 thereof.

Section 1448, Code of 1906, Hemingway's Code. section 1205, which also appeared in the Code of 1857, at page 618, authorizes an officer or private person in order to make an arrest without a warrant to enter "any dwelling or house in which he has reason to believe the offender

may be found," and in *Monette* v. *Toney,* 119 Miss. 846, 81 So. 593, 5 A. L. R. 261, was held not to be in conflict with section 23 of the Constitution and to authorize the entry and search of a dwelling house without a warrant therefor for the purpose of arresting a person charged with the commission of a crime.

It thus appears that the reasonableness of a search or seizure is not determined either at common law or under our statutes by the presence or absence of a warrant therefor. It is a judicial question to be determined by the court in each case, taking into consideration the place searched, the thing seized, the purpose for, and the circumstances under which the search or seizure was made, and the presence or absence of probable cause therefor. *Carroll* v. *United States, supra; Haywood* v. *U. S.* (C. C. A.), 268 F. 803; *United States* v. *Bateman* (D. C.), 278 F. 231; *O'Connor* v. *United States* (D. C.), 281 F. 396; *Lambert* v. *United States* (C. C. A.), 282 F. 413; *Katz* v. *Eldridge,* 96 N. J. Law, 382, 118 A. 242.

As pointed out by the supreme court of the United States in the Carroll case, Congress has always so understood the search and seizure provision of the Federal Constitution, and beginning with its first session in 1789, it has continuously discriminated between dwelling houses and similar places and boats and vehicles, as has our legislature here, by requiring a warrant for the search of the former and permitting a search of the latter without a warrant. The impracticability in most cases of obtaining a warrant for the search of swift moving vehicles and boats before they can be moved beyond reach justifies the distinction made between them and dwelling houses and similar places, and renders a search of vehicles and boats without a warrant reasonable.

The purpose for which the search was here made, and which the statute authorizes, is, of course, reasonable, for it was made in order that a thing which it is unlawful to possess, and which by its very existence offends against the law, might be seized and destroyed.

The search of an automobile without a warrant for contraband being transported therein is reasonable and is not prohibited by section 23 of the Constitution, provided the officer who made the search had probable cause therefor, to which question we now come.

The statute permits an officer to search any vehicle, boat, etc., in which he has reason to believe and does believe that intoxicating liquor is being transported in violation of law. The officer who made the search here believed that intoxicating liquor was being transported in the automobile searched, the reason for the belief being that he had been advised by another police officer whom he regarded as a credible person that intoxicating liquor was being transported in the automobile. Information and belief has always been considered sufficient probable cause to justify a search and seizure and was so held by this court in *State* v. *Quintini*, 76 Miss. 498, 25 So. 365; *Loeb* v. *State,* 133 Miss. 883, 98 So. 449; *Bufkin* v. *State,* 134 Miss. 1, 98 So. 452.

If it be said that an arrest for a misdemeanor is authorized at common law only when committed in the presence of the person making the arrest and therefore the seizure of contraband, the possession of which is a misdemeanor and not a felony, should be permitted only when a knowledge of the existence thereof is acquired by the person making the seizure in the same way that he becomes conscious of the commission of a misdemeanor in his presence, that is through his senses, the answer, as pointed out by the supreme court of the United States in the Carroll case, *supra,* is that the distinction between felonies and misdemeanors is of no consequence in this connection, for the reason that the legislature has full power to classify an offense either as a misdemeanor or as a felony; the classification being determined by the punishment inflicted therefor. Section 1578, Code of 1906; Hemingway's Code, section 1345.

It may not be amiss to say that the difference in the security afforded the citizen by requiring searches and

seizures to be made only on a warrant therefor, and that afforded by permitting them to be made without a warrant on probable cause, is more apparent than real. The warrant issues on the affidavit of any credible person that he has reason to believe and does believe that intoxicating liquor is being stored, etc., in a described place, or "is being transported in any" vehicle or boat and protects the officer who makes the search under it. When a search is made without a warrant, the person making it must justify his act in so doing by proving that he had probable cause therefor. In the case at bar the officer could have obtained a warrant to search the automobile, though when the warrant was obtained the automobile might have been beyond reach, by making the same oath before a magistrate that he made on the trial in the court below; that is, that he had good reason to believe and did believe that intoxicating liquor was being transported in the automobile. The penalty for false swearing by the officer and the appellant's remedy therefor would have been the same in either case.

The appellant relies on the line of cases beginning with *Tucker* v. *State,* 128 Miss. 211, 90 So. 845, 24 A. L. R. 1377, in which this court held that the evidence obtained by means of a search or seizure without a warrant was not admissible in a criminal trial against the person whose property was searched or seized. The power of the legislature to authorize a search or seizure without a warrant was not involved in any of those cases, and of them only the cases of *Butler* v. *State,* 129 Miss. 778, 93 So. 3, *Taylor* v. *State,* 129 Miss. 815, 93 So. 355, and *Porter* v. *State,* 135 Miss. 789, 100 So. 377, deal with the search of a vehicle in which intoxicating liquor was being transported. They were decided before the statute here under consideration, which permits the search of a vehicle or boat without a warrant, was enacted, and there was no pretense in any of them that the person by whom the search or seizure was made had probable cause therefor; consequently section 23 of the Constitution was vio-

lated thereby. In none of those cases was the power of the legislature to authorize a search or seizure of a vehicle or boat without a warrant considered, and they are not here in point.

Section 2, chapter 244, Laws of 1924, is valid, and the judgment of the court below will be affirmed.

*Affirmed.*

HOLDEN, J., concurring.

ANDERSON and ETHRIDGE, JJ., dissenting.

HOLDEN, J. (concurring). Viewing the search and seizure provision of the Constitution in the light of its history, I am reasonably convinced that the protection given against search and seizure was intended primarily to apply only to the person and private premises of the citizen, such as the home, or other private place, and its immediate appurtenances (the castle and curtilages).

It is true the letter of the provision covers all possessions and property of a citizen; but it was never meant, in my judgment, to cover such things as fast moving vehicles upon the public highways, airships, or boats upon the public waters. Such possessions were not anticipated and are not within the contemplation of the Constitution; they are not of that private and stationary character which was intended to be protected against search and seizure without a warrant.

If it be held, in this day and time, that a search warrant is necessary to search an automobile speeding upon the public highway, then the right of search and seizure by the government for contraband would be partially destroyed, for under such circumstances the swift moving vehicle could not be searched because it would get beyond the reach of the officer before a search warrant could be secured. Surely governmental authority, in the enforcement of the criminal laws, is not to be defeated in this manner. The fleeting nature of the thing to be

searched necessitates prompt action, and if delayed, in order to first secure a warrant, the officers of the government would be helpless to enforce the law in proper cases.

Under such necessitous circumstances, the search for contraband may be made without a warrant if made upon probable cause. The very exigencies of the situation justify the reasoning that the constitutional provision was never intended to mean that every kind of search without a warrant would be unreasonable.

Therefore I am of opinion the Constitution did not intend to require a warrant to search those possessions in use on the public ways which are of such a character as would make it impracticable to first secure a warrant before making a search; and more especially is this true where the fast moving vehicle is speeding upon the public highway at the time the probable cause for the search appears to the officer.

I go no further with reference to the right of search and seizure without a warrant, upon probable cause, than indicated above. The private home and possessions and person are certainly to be protected against unreasonable search and seizure, and a warrant therefore, in my judgment, is required before such search and seizure can be lawfully made.

ETHRIDGE, J. (dissenting). I find myself wholly unable to agree to the conclusions and pronouncement of the majority opinion in this case. It is a case of the utmost importance, involving as it does one of the most important provisions of the Bill of Rights in the Constitution. I shall therefore state my views and support them with authorities taking those views which I believe demonstrate the correctness of my position and the error of the majority opinion.

First, I want to say that my views are not in any way colored by any sympathy for the appellant or any of the class against whom the statute here under consideration is primarily directed. I rejoice that calamity has come upon the illicit manufacturer of intoxicating liquors, the

rum runner, and the bootlegger; but I mourn the loss of the liberty of the whole citizenship of the state which I conceive to be destroyed in a most important and vital particular. I believe fully in the prohibition of the sale and manufacture of intoxicating liquors. I would be glad to see that pernicious industry totally destroyed and the art of its manufacture forgotten. I am sensible of the great evils that the use of intoxicating liquors has brought about in the world, but they are not new in any sense. That iniquitous business was openly carried on and widely tolerated at the time the principles embodied in section 23 of the Constitution were first crystallized into a supreme law. It is unfortunate for those who are charged with maintaining the Constitution that they must do so in cases where the parties involved richly deserve the severest penalties of the law. The questions involved in this proposition generally arise in criminal cases where the defendants had so conducted themselves as to be unworthy of the protection of the law. Nevertheless the Constitution is designed to give all people the protection of privacy in their homes and to prevent the seizure of their persons and property except in proper cases in a way pointed out.

Liquor cases are not the only ones that a search warrant will be used for. It will affect the citizen in a great variety of cases. Originally, the search warrants of a general nature were used by monarchs for the purpose of discovering seditious writings. They will exist, also, to discover the private affairs of the citizen in aid of the government's revenues, such as tariff taxes, duties, income taxes, inheritance taxes, etc. Under chapter 194, Laws of 1918, it is provided for physical examination of persons affected by certain diseases, and searches and seizures will be made for this purpose with or without a warrant. Under sections 1025, 1026, Hemingway's Code, obscene literature and pictures are denounced and prohibited from being possessed. Search warrants or searches without warrant will be used for the purpose of

discovering whether such articles are possessed. Under section 623 and 625, Hemingway's Code, cocaine and other narcotics are prohibited from being possessed and search warrants provided for, and the same search will be used in that case as in the liquor case with necessarily a more particular examination of the person.

The Federal government may enact additional statutes in aid of its powers similar to the Espionage Act, and the seditious literature act referred to in *Debs* v. *United States,* 249 U. S. 211, 39 S. Ct. 252, 63 L. Ed. 566; *Abrams* v. *United States,* 250 U. S. 616, 40 S. Ct. 17, 63 L. Ed. 1173. See, also, *State* v. *Moilen,* 140 Minn. 112, 167 N. W. 345, 1 A. L. R. 331, holding that a state may prohibit syndicalism and the advocacy of sabotage, or that other methods of terrorism may be prohibited, and for such literature searches could be authorized without warrant if the majority opinion is sound. These are only a few of the many purposes for which searches without warrant could be authorized by law under the powers of the state or Federal governments illustrated by these decisions. They illustrate the great danger to all liberty and privacy that may be incurred by the holdings of the majority opinion.

But let us return to the section of the Constitution involved and review the authorities pertinent to the question before us.

Section 23 of the Constitution reads:

"The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized."

The first part of the provision was intended primarily as a restraint upon the power of the legislature to enact laws authorizing searches and seizures. The laws could only be enacted so as to give the right of search or seizure in proper or reasonable cases. Such a statute must

be on its face a reasonable one. No search or seizure can be made unless based upon a reasonable law. It is true that it also applies to every officer and department of the government, but without a statute first enacted authorizing the search or seizure none could be made other than that which existed at the common law. The officers of the government could not extend the conditions of search or seizure. They were confined to the cases and conditions existing at the common law, and the right of search was limited to a very few objects by that law. At common law the right did not exist to search for the possession of intoxicating liquors, because the sale and possession of intoxicating liquors was entirely permissible. At the time of the promulgation of the Constitution, there was no such thing known as giving an officer authority by statute to make a general search in any case. No search whatever was authorized but by some kind of a warrant issued by an officer of the law authorized to issue it. There were two kinds of searches which were known to the history of the country at the time of the orig inal adoption of the Constitution in the several states and the ten amendments to the Constitution of the United States. Both kinds of searches were authorized by warrants issued by officers of the government on complaint either of a citizen or some officer of the government. One was a general warrant which did not describe specially the place to be searched or the person or thing to be seized, but the officer was armed with a warrant authorizing him to search for a particular purpose within his jurisdiction. These were known as ''general warrants'' and were conceived to be very hurtful to the legal rights of the citizen. There were also special warrants specially designating the person or thing to be seized or the place to be searched, and the thing to be seized if discovered by such search. The special warrants formally, which described the place or person to be searched or seized, were not offensive to popular conceptions of right.

It was the purpose of the constitutional provision to limit searches and seizures to cases where an oath was made, before an officer authorized to take it, that there were grounds for the search and the person must be named and the place described in this affidavit, so that the activities of the officers would be limited and restricted to the warrant itself. It is clear that it was contemplated that no search as such would be permitted at all unless the warrant issued. Neither king nor constable nor any intermediate officer could invade the home or property of the citizen under a blanket warrant or a general law. There was, it is true, a limited right of search where a person was lawfully arrested; but this limited right does not carry with it the right to make a general search. We dealt with and defined that right as it exists in this state by statute and at common law in *Toliver* v. *State,* 133 Miss. 789, 98 So. 342, and cited the authorities in that opinion which discussed fully and elaborately the rights and limits in making a lawful search. Section 23 of the Mississippi Constitution intends to secure to the citizens of this state the liberty as it existed at the common law as a minimum liberty. That liberty was so important in the estimation of the Fathers that it was to be put beyond the power of the legislature or any other part of the government created by them, so that no officer of the government could arbitrarily deal with the citizen or his property.

In determining the meaning of the Constitution, we should go to the common law as it existed and was understood at the time of the Revolution. The constitutional provision spoke the language of the common law at the time. Great indignities had been perpetrated upon the colonies through the instrumentalities of writs of assistance which were general search warrants and which were extremely odious to the citizens of this country, and when the Fathers set up the independent government of the states then existing and of the United States, the provision was placed in the Constitution to forever protect the

citizens from an arbitrary invasion of their rights of person or property at the hands of the government or any officer acting in its name or under its authority.

In *Ex parte Philip Grossman*, decided March 2, 1925, by the supreme court of the United States, 45 S. Ct. 332, 69 L. Ed. —, the supreme court of the United States was called upon to decide whether, under the power of the Federal Constitution, the President could pardon a person sentenced for a contempt of court. The Chief Justice, speaking for the court, said:

"The language of the ‚Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted. The statesmen and lawyers of the convention who submitted it to the ratification of the convention ' of the Thirteen States were born and brought up in the atmosphere of the common law, and thought and spoke in its vocabulary. They were familiar with other forms of government, recent and ancient, and indicated in their discussions earnest study and consideration of many of them, but when they came to put their conclusions into the form of fundamental law in a compact draft, they expressed them in terms of the common law, confident that they could be shortly and easily understood.

"In a case presenting the question whether a pardon should be pleaded in bar to be effective, Chief Justice MARSHALL said of the power of pardon (*United States* v. *Wilson*, 7 Pet. 150, 160, 8 L. Ed. 640):

" 'As this power had been exercised, from time immemorial, by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance, we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it.' "

The court, in the *Grossman case, supra,* also quoted from *Ex parte Wells,* 18 How. 307, 311 (15 L. Ed. 421), as follows:

"At the time of our separation from Great Britain, that power had been exercised by the king, as the chief executive. Prior to the Revolution, the colonies, being in effect under the laws of England, were accustomed to the exercise of it in the various forms, as they may be found in the English law books. They were, of course, to be applied as occasions occurred, and they constituted a part of the jurisprudence of Anglo-America. At the time of the adoption of the Constitution, American statesmen were conversant with the laws of England, and familiar with the prerogatives exercised by the crown. Hence, when the words to grant pardons were used in the Constitution, they conveyed to the mind the authority as exercised by the English crown, or by its representatives in the colonies. At that time both Englishmen and Americans attached the same meaning to the word 'pardon.' In the convention which framed the Constitution, no effort was made to define or change its meaning, although it was limited in cases of impeachment."

In *South Carolina* v. *United States,* 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737, the court was called upon to discuss the delimitation of powers between the states and the nation. The question there involved was whether South Carolina in operating the dispensary system of selling intoxicating liquors was subject to the license imposed on that business by the United States government. The court said (199 U. S. 456, 26 S. Ct. 114, 50 L. Ed. 267):

"In order to determine to what extent that implication will go we must turn to the condition of things at the time the Constitution was framed. What, in the light of that condition, did the framers of the convention intend should be exempt? Certain is it that modern notions as to the extent to which the functions of a state may be carried had then no hold. Whatever Utopian theories may have

been presented by any writers were regarded as mere creations of fancy, and had. no practical recognition. It is true that monopolies in respect to certain commodities were known to have been granted by absolute monarchs, but they were not regarded as consistent with Anglo-Saxon ideas of government. The opposition to the Constitution came not from any apprehension of danger from the extent of power reserved to the states, but, on the other hand, entirely through fear of what might result from the exercise of the powers granted to the central government. While many believed that the liberty of the people depended on the preservation of the rights of the states, they had no thought that those states would extend their functions beyond their then recognized scope, or so as to imperil the life of the nation. . . .

"If we look upon the Constitution in the light of the common law, we are led to the same conclusion. All the avenues of trade were open to the individual. The government did not attempt to exclude him from any. Whatever restrains were put upon him were mere police regulations to control his conduct in the business, and not to exclude him therefrom. The government was no competitor, nor did it assume to carry on any business which ordinarily is carried on by individuals. Indeed, every attempt at monopoly was odious in the eyes of the common law, and it mattered not how that monopoly arose, whether from grant of the sovereign or otherwise. The framers of the Constitution were not anticipating, that a state would attempt to monopolize any business heretofore carried on by individuals."

The same ideas and principles are elaborately discussed in *Boyd* v. *United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746. The history of the Fourth and Fifth Amendments of the Constitution of the United States in relation to search and seizure and compelling testimony against oneself by means of compulsory process or compulsory action of officers was discussed. Among other

things, the court there said (116 U. S. 630, 6 S. Ct. 532, 29 L. Ed. at page 751):

"The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions, on the part of the government and its employees, of the sanctity of a man's home and the privacies of life."

In *State* v. *Kees*, 92 W. Va. 277, 114 S. E. 617, 27 A. L. R. 684, the court said:

"In the application of any constitutional provision it is always important to inquire what was the state of the law at the time such provision became part thereof. Under the common law in effect in this country at the time of the adoption, not only of the Federal Constitution, but of the various state Constitutions, search and seizure warrants were issued; but they were only allowed to be issued upon a complaint made upon the oath or affirmation of the party seeking the same. The English Constitution had guaranteed to the citizen this immunity to his person and premises from search and seizure from a time whereof the memory of man runneth not to the contrary, and we think it may be said that, when the constitutional provision relied upon came into the organic law of the American States, the purpose was to preserve to the citizen the right then enjoyed by him under the common law of England."

There are numerous other authorities to the same effect which will be referred to further along in this opinion.

The power to either arrest without a warrant or search without a search warrant did not exist at common law, except a person might be arrested for a misdemeanor committed in the presence of an officer or for a felony committed where the officer had probable cause for believing that the person arrested had committed a felony.

In discussing the right of arrest at common law in *Kurtz* v. *Moffitt,* 115 U. S. 487, 6 S. Ct. 148, 29 L. Ed. 458, the court said:

"If a police officer or a private citizen has the right, without warrant or express authority, to arrest a military deserter, the right must be derived either from some rule of the law of England which has become part of our law, or from the legislation of Congress.

"By the common law of England, neither a civil officer nor a private citizen had the right, without a warrant, to make an arrest for a crime not committed in his presence, except in the case of felony, and then only for the purpose of bringing the offender before a civil magistrate. 1 Hale, P. C. 587-590; 2 Hale, P. C. 76-81; 4 Bl. Comm. 292, 293, 296; *Wright* v. *Court,* 6 Dowl. & R. 623; s. c., 4 Barn. & C. 596. No crime was considered a felony which did not occasion a total forfeiture of the offender's lands or goods or both. 4 Bl. Comm. 94, 95; *Ex parte Wilson,* 114 U. S. 417, 423; S. C. 5 Sup. Ct. Rep. 935. And such a forfeiture did not follow upon conviction of a court-martial of a crime not punishable by the courts of common law. Co. Litt. 391·a.; 1 Clode, Mil. F. C. 176."

In the case of *In re Swan,* 150 U. S. 637, 14 S. Ct. 25, 37 L. Ed. 1207, the supreme court of the United States, in considering whether a state officer making a search of property and seizing it was in contempt of the Federal court, held that the Dispensary Act of South Carolina (Laws 1907, p. 463), under which the officer was attempting to make a search, did not authorize a search without a warrant and that a search without a warrant did not exist at common law.

In the case of *John Bad Elk* v. *United States,* 177 U. S. 529, 20 S. Ct. 729, 44 L. Ed. 874, in discussing the legality of an arrest in the territory of South Dakota, it was held that an officer at the Pine Ridge Indian Reservation in South Dakota had no authority to arrest a resident on such reservation without a warrant on the charge of a

misdemeanor not committed in his presence.  The court said (177 U. S. 534, 20 S. Ct. 731):

"At common law, if a party resisted arrest by an officer without warrant and who had no right to arrest him, and if in the course of that resistance the officer was killed, the offense of the party resisting arrest would be reduced from what would have been murder if the officer had had the right to arrest, to manslaughter.  What would be murder if the officer had the right to arrest might be reduced to manslaughter by the very fact that he had no such right.  So an officer, at common law, was not authorized to make an arrest without a warrant, for a mere misdemeanor not committed in his presence."

In Rawle on the Constitution of the United States, published in 1829, the author says, at page 127: "The term 'unreasonable' is used to indicate that the sanction of a legal warrant is to be obtained, before such searches or seizures are made."

In *Hoyer* v. *State,* 180 Wis. 407, 193 N. W. 89, 27 A. L. R. 673, the supreme court of Wisconsin held the search of an automobile standing in a highway and the seizure of liquor found therein without warrant for either the search or the arrest of the owner of the car violates the constitutional guaranty against unlawful searches and seizures.  The court said (180 Wis. 417, 193 N. W. 93, 27 A. L. R. 680):

"Such constitutional provisions here invoked are not grants of rights of action for trespass against official or individual violators of such guaranteed rights, for other provisions of the Constitution give such remedies.  To say, then, that when the state itself has thus violated its own pledges, it may use the results thereby obtained for its own purpose, become a party to the trespass by ratification, trace its title through wrongful acts of its officers, remain itself immune, in its sovereignty, from legal liability, and then relegate the individual whose rights are thus swept away and made valueless in and by a court of justice, to his bootless and fruitless action of

trespass against such trespassing state officials as individuals, is to gibe and to jeer.''

One of the ablest discussions of the whole subject that I have found in the books anywhere is the dissenting opinion of Judge WIEST, in *People* v. *Case*, 220 Mich. 379, 190 N. W. 289, 27 A. L. R. 686, at page 692 *et seq.* In that case the majority of the court held that an automobile standing on a public fairground and unattended might be searched by a policeman and evidence obtained thereby admitted, basing the decision upon the fact that the automobile was in a public place over which the police officer had full control. In the course of his dissenting opinion, concurred in by Chief Justice FELLOWS and Judge BIRD (220 Mich. 392, 190 N. W. 293, 27 A. L. R. 693), Judge WIEST said:

''The officer in this case had no warrant, unless we consider the liquor law his warrant. If the liquor law is considered as his warrant, then he acted under general warrant to the same extent as though a warrant had been issued by a magistrate with direction to search for intoxicating liquors where he willed, to subject persons and their possessions to search upon suspicion, and to lug the result of his search, if any, to a magistrate and there make complaint. If officers without a warrant, and upon a mere hunt for liquor and cause for arrest, may enter an automobile at will and make search therein, then they may stop any automobile upon any public highway and make search, may pry into the packages and bundles and baskets in every automobile parked at the curb in any city, may compel travelers to open and expose the contents of their hand baggage and parcels, make women shoppers open their hand bags, pry into trunks at depots, and in general proceed on the assumption that every person is guilty of having intoxicating liquors until exposure of their possessions satisfies the officers to the contrary, and in general so humiliate, vex, and annoy decent people as to constitute themselves a common nuisance.''

In *People* v. *Castree,* 311 Ill. 392, 406, 143 N. E. 112, 117, 32 A. L. R. 357, 365, the question of search and seizure is discussed in an elaborate opinion in which Judge DUNN, says:

"A consideration of the origin, history, and use of writs of assistance in England, of their use in this country, and the evolution of the Fourth Amendment to the Federal Constitution. manifests the importance of this safeguard of the citizen against unreasonable searches and seizures of his person or property, and the necessity that it shall not be frittered away by the courts by a narrow and illiberal construction and a willing blindness and indifference to its violation.    The language of the supreme court of Tennessee in *Hughes* v. *State,* 145 Tenn. 544, 20 A. L. R. 639, 238 S. W. 588, meets with our approval: 'The state, having through its executive representatives produced the evidence of a violation of the law by one of its citizens by means prohibited by the Constitution, cannot be permitted through the judicial tribunal to utilize the wrong thus committed against the citizen to punish the citizen for his wrong;' for it was only by violating his constitutionally protected rights that his wrong has been discovered.    It is no answer to say that it matters not how a citizen's sins have been found out.    Security from unlawful search is the right guaranteed to the citizen, even for the discovery of the citizen's sins.    This right we must protect, unless we may with impunity disregard our oath to support and enforce the Constitution.    The experience of our forefathers with unlawful searches and seizures was deemed by the people who framed the Constitution sufficient to warrant the provision by which, in instances, even the guilty might escape detection and punishment.    We are not to be understood as holding that all evidence obtained by unlawful means is inadmissible, but only where, in cases such as we have here, the evidence offered has been produced by violating the constitutional protection against unlawful searches and seizures."

In *State* v. *Owens,* 302 Mo. 348, 259 S. W. 100, 32 A. L. R. 383, the supreme court of Missouri held that it was not within the power of the legislature to enact the statute which would permit an unreasonable search and that the evidence obtained by means of an illegal seizure and search was not admissible. The court said in its opinion (302 Mo. 358, 259 S. W. 101, 32 A. L. R. 386):

"It is not within the power of the legislature to enact a statute which will permit an unreasonable search. *People* v. *Milone,* 119 Misc. 22, 195 N. Y. S. 488; *People* v. *Case,* 220 Mich. 379, 27 A. L. R. 686, 190 N. W. 289; *United States* v. *Rembert* (D. C.), 284 F. 996; *Lowry* v. *Rainwater,* 70 Mo. 152, loc. cit. 158, 159, 35 Am. Rep. 420."

The questions of arrest without warrant and of searches and seizures are contained in the same section of the Constitution. There are many cases holding that it is not permissible to enact a statute abridging the security of the section of the Constitution which gives the right.

In the case of *Ex parte Rhodes,* 202 Ala. 68, 79 So. 462, 1 A. L. R. 568, the Alabama supreme court held that a municipal corporation cannot in view of the constitutional provision guarantee due process of law authorizing arrest on mere verbal complaint to an officer by a citizen of trespass upon his property. The discussion is both able and exhaustive, there being both majority and dissenting opinions. The court speaking through Judge MAYFIELD discussed the power of policemen of a city to make arrest on verbal complaint of a misdemeanor not committed in the presence of an officer. In that case a policeman was acting under an ordinance of the city of Birmingham which authorized the arrest by a policeman without a warrant, for a misdemeanor or a violation of any municipal law of the city, though the offense was not committed in the presence of the officer. The court said:

"To hold an arrest lawful and reasonable, such as is shown in the opinions to which reference is made, is, in

legal effect, to nullify several provisions of our Bill of Rights, as well as section 89 of the Constitution.

"When the people of this state, through their representatives, met in convention to form this state government, they reserved to themselves and their descendants and successors certain rights, liberties, privileges, and immunities, which they did not surrender or cede to the government to be created by the convention. They also exacted guaranties of the government so formed to protect each person in the state, and to secure to him the enjoyment and exercise of these rights, liberties, privileges, and immunities, so reserved against encroachment or destruction thereof by other persons, whether majorities or minorities of the whole, or officers of any department of the government itself. . . .

"The various phrases and clauses used by the convention to describe the reserved rights, liberties, immunities, and privileges then had well-known meanings; many of them are to be found in the Magna Charta and other charters of liberties, then claimed by our ancestors as a part of the law of the land; and many of them were then embedded in the Constitution of the United States, and had been construed by the supreme court of our country to mean what they meant at common law. It would be unreasonable to suppose that our Constitution makers used these phrases or clauses otherwise than as then defined by the common law or the law of the land. The first clause in the fifth section of the Bill of Rights, "That the people shall be secure in their persons, houses, papers and possessions from unreasonable seizure or searches,' then had a well-known meaning, and the same phrase had been often defined by the courts, state and Federal. It must be presumed that the makers of the Constitution adopted it under its then construction. If it was not intended to prevent the government then being formed from authorizing or legalizing arrests like this, then the part which applies to the seizure of the person is worthless. . . . These phrases are limitations upon the

power of the legislature, as well as upon that of the other departments of government, or of their officers. . . .

"The general rules for the construction of statutes— that they are valid unless their prohibition can be found on the written pages of the Constitution, state or Federal, and that they must be held valid unless the court can say beyond a reasonable doubt that they are void— do not apply when the reserved rights, liberties, immunities, and privileges of the citizens are involved. That is, when the inalienable rights of the citizens are involved. As section 36 of the Bill of Rights declares: 'This enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate.' "

The court then reviews and quotes from many opinions in other states as well as other Alabama cases, and then says:

"Certainly, the sections of the Bill of Rights which prohibited unreasonable seizures and arrests, and which prohibited accusations, arrests, or detentions, except in cases ascertained by law, meant the law of the land as then ordained, and not any municipal law that might thereafter be ordained." 202 Ala. 73, 79 So. 467, 1 A. L. R. at page 578.

In the case of *In re Kellam,* 55 Kan. 700, 41 P. 960, it was held that a statute of the state of Kansas conferring authority upon police officers of a city of the first class to make an arrest, so far as it attempts to authorize an arrest without a warrant for a misdemeanor not committed in view of the officer, and merely upon suspicion, is unconstitutional and void. The Kansas statute was:

"'The city marshal or any policeman shall at all times have power to make or order an arrest upon view of an offense being committed, or upon reasonable suspicion that an offense has been committed, with or with-

out process, for any offense against the laws of the state or of the ordinances of the city, and to bring the offender for trial before the proper officer of the city: Provided, that any person arrested for any offense without process shall be entitled, on demand before trial, to have filed a complaint on oath in writing; and such person shall not at that time be tried for any other offense than that for which he was arrested and for which the complaint shall be filed.' Gen. Stat. of 1889, section 623.''

That court said (55 Kan. at pages 702, 703 [41 P. 961]):

''Under the common law arrests without warrants were not permitted, except for offenses committed in the view of the officer; and in cases of felony actually committed the officer might also arrest without process upon a reasonable suspicion. The liberty of the citizen was so highly regarded, however, that the officer arresting the supposed felon without warrant must have acted in good faith, and upon grounds of probable suspicion that the person arrested was the actual felon. Felonies were excepted on account of the gravity of such offenses, and because the public safety and the prompt apprehension of criminals charged with offenses so heinous seemed to require that such arrests should be made without warrant. The powers of officers to make arrests have been extended to some extent by statutes, but it is generally held that officers cannot be constitutionally clothed with authority to arrest without warrant for minor offenses not committed in their presence or view. *Pinkerton* v. *Verberg,* 78 Mich. 573; *Robison* v. *Miner,* 68 Mich. 549; *Shanley* v. *Wells,* 71 Ill. 78; *Jamison* v. *Gaernett,* 10 Bush, 221; *The State* v. *Freeman,* 86 N. C. 683; *Doering* v. *The State,* 49 Ind. 56; 11 Cent. L. J. 331; 1 Am. & Eng. Encyc. of Law, 732; 7 Id. 675.''

In *Lippman* v. *People,* 175 Ill. 101, 51 N. E. 872, the supreme court of that state declared the Trade-Mark Act of 1873 (Rev. Stat. 1874, p. 1084), violative of section 22 of article 4 of the Constitution, concerning special legislation, and of section 6 of article 2 of the Constitution,

concerning unreasonable searches and seizures. It held a search is unreasonable, within the meaning of the Constitution, the object of which is to enable an individual who has scattered his property abroad to search the premises of parties suspected of using such property without written consent, in order to regain the same, and thus collect evidence leading to prosecution.

This case, *Lippman* v. *People, supra,* illustrates the meaning of the term "unreasonable" as applied in section 23 of the Constitution of Mississippi. It had reference to what the legislature might authorize a search warrant to be obtained for. It must be a reasonable purpose, a public purpose as distinct from a mere private purpose. It was intended as a limitation on the power of the legislature to enlarge the things for which a search warrant could be issued. It is true that an officer serving a valid search warrant would be liable civilly for making a search that unreasonably annoyed and interfered with the rights of the citizen; but this unreasonableness of service would not affect the warrant, but would make the officer liable for the unreasonable manner in which he needlessly infringed upon the right of the citizen.

In *Fairmont Athletic Club* v. *Bingham,* 61 Misc. Rep. 419, 113 N. Y. S. 905, is an interesting discussion of the constitutional rights of citizens and the power of officers to make arrest without warrant and to search without warrants. In that case an injunction was sued out to prevent the police of New York from annoying the complainant and its business by threats of constant raids upon its place. The defendant was a captain of police and entered plaintiff's premises with a squad of six policemen when a business meeting was being held and refused to leave or to withdraw his men when requested to do so. At the time of this trespass no sparring exhibition was being given. The defendant threatened to repeat the trespass whenever in his opinion or judgment it was necessary. Defendant's position briefly stated was that it was the duty of the police "to nip mischief in

the bud'' and that to this end the police may without war-
rant enter with force the premises of the plaintiff and
remain therein as long as they deem necessary to ascer-
tain whether or not acts which they deem misdemeanors
are being committed or are likely to be committed. The
mere asking of this question shows that it must be an-
swered in the negative. The duty of police officers, like
all other public servants, is fixed and defined by law, and
when they act contrary to this duty they become wrong-
doers and violators of law. It is an essential character-
istic of free government that every official is himself
subject to the law, and that none are above it. At com-
mon law and under the statute law of New York a police
officer has no right to arrest without warrant in cases of
misdemeanor when the crime was not committed or at-
tempted in his presence.

See *People* v. *Glennon*, 37 Misc. Rep. 1, 5, 74 N. Y. S.
794, at page 796, where Judge GAYNOR says:

''Instead, the jury, as it seems to me, should have been
carefully instructed as to the strict and jealous limitations
which the law puts on the power of policemen to enter
houses or make arrests. For instead of police officers
having the tyrannical powers of arrest attributed to
them, they in fact have no power to arrest for a criminal
offense without a warrant which every citizen does not
possess. Every citizen has always had, and is expressly
given by statute (Code Cr. Proc., section 183), the right
and the power to arrest and take before a magistrate
without warrant a person who commits any criminal of-
fense, whether misdemeanor or felony, in his view; and
if a felony has in fact been committed, although not in
his view, he may in like manner arrest without warrant
the person who committed it.   .   .   .

''But the law does not tolerate the idea that any one
may be arrested by a police officer for an alleged crim-
inal offense of the grade of misdemeanor only, except on
a warrant duly obtained from a magistrate, unless the
offense was committed in the view of the officer.   .   .   .

138 Miss.—12.

"'The far-reaching constitutional maxim that every man's house is his castle has a history and a literature all its own, and is still as expressive and pregnant of the individual rights and liberties of a free people as when it first emanated from what Coke called the unpolished genius of the people. It burst asunder the bonds of despotic power. It is as vital now as when Chatham said of it:

" ' 'The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement.' Cooley, Const. Lim. 364.''

In *Pickett* v. *State,* 99 Ga. 12, 25 S. E. 608, 59 Am. St. Rep. 226, the supreme court of Georgia held that though an officer is given authority by statute, without warrant, to arrest for an offense committed in his presence, he he has no right, upon suspicion, nor from information derived from others, to arrest a citizen and search his person to ascertain whether he is carrying a concealed weapon in violation of law; that though one has a concealed weapon on his person in violation of law, he cannot be regarded as committing an offense in the presence of an officer where his weapon is not seen, and could not be seen, by the latter except by search of his person. In the course of its opinion the court said:

"The Constitution of this state expressly declares in the Bill of Rights that: 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' Code, section 5008. If any search is unreasonable and obnoxious to our fundamental law, it is one of the kind with which we are now dealing. Even if the person arrested did in fact have a pistol concealed about his person, the fact not being discovered without a search, the offense of thus carrying it was not, in legal contemplation, committed in the presence of the officer, and the

latter violated a sacred constitutional right of the citizen in assuming to exercise a pretended authority to search his person in order to expose his suspected criminality.''

See, also, case note to *Pickett* v. *State, supra; Douglass* v. *State,* 152 Ga. 379, 110 S. E. 168, to same effect. See, also, *Roberson* v. *State,* 43 Fla. 156, 29 So. 535, 52 L. R. A. 751; *Caffinmi* v. *Herman,* 112 Me. 282, 91 A. 1009; *State* v. *Lutz,* 85 W. Va. 330, 101 So. 434. Also note to *State* v. *Evans,* 84 Am. St. Rep. at page 682 et seq.

In *State* v. *Freeman,* 86 N. C. 683, it is said that the arrest without warrant was lawful only in cases where public security required it and for a violation of the law in the officer's presence. See, also, *Way's Case,* 41 Mich. 229, 1 N. W. 1021.

It is also said in the case note to 84 Am. St. Rep. at page 685, that an officer may arrest without warrant for a breach of the peace committed in his presence. This was the rule at common law, and has never been changed. The offense must be a breach of the peace, however, to warrant an arrest at common law, for there may be minor offenses within view of the officer which do not amount to breaches of the peace, and for which no arrest could be made without a warrant, unless the right to arrest had been enlarged by statute. At page 687, 84 Am. St. Rep. it is said in said note:

''*Breach of Peace Not in Officer's Presence.*—As already indicated by the authorities cited, an officer can arrest for a breach of the peace only when it is committed in his presence. This was the common-law rule, and it is the rule very generally under the statutes of the various states. (Citing authorities.) . . . An officer who was in one street and heard shooting in another street at night, but who was not where he could see or tell who did it, has no authority to arrest upon information received from a third person. *People* v. *Johnson,* 86 Mich. 175, 24 Am. St. Rep. 116, 48 N. W. 870.''

In Cooley's Constitutional Limitations, at star pages 299 to 308, the subject is elaborately discussed and the

situation as it existed in England and America during the period immediately preceding and during the Revolution is set forth. Mr. Cooley appends a note in which he quotes elaborately from a constitutional history of England dealing with the subject in England during troublesome times which is well worthy of thoughtful consideration by any liberty-loving man.

In the cases above referred to, and in *Entick* v. *Carrington,* 19 Howell, St. Tr. 1029, and *Weeks* v. *United States,* 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, it was firmly established that a search without a warrant particularly describing the person or thing to be seized and the place to be searched was illegal.

Preceding that period under the reign of the Tudor Kings and the Stuart Kings, general warrants had been issued and many people had been arrested and many searches had been made, even Lord Coke, the great Chief Justice, who refused to bow before kingly authority, two days before his death was searched under one of these general warrants, and his manuscript seized and carried away. During the period of the writs of assistance in this country against which the patriot James Otis declaimed so eloquently and forcibly, resigning his office as attorney for the government so as to be enabled to antagonize these writs, he disclosed in his speech an instance where a judge tried a person for a crime and sentenced him therefor; when the judge had finished, the culprit, who seems to have been one of the puppets of the crown, asked him if that was all he had to say. The judge replied that it was, and the culprit said:

"I have something to say. I have a warrant in my pocket authorizing me to search all persons and places. I go now to search your honor's place."

And he did so, having a general warrant therefor.

These instances show that when general warrants are allowed or searches authorized by a statute like the one we have under discussion in the present case, that

searches will not be confined to criminals, but will be used against all those who incur the displeasure of such officers having such powers.

In Cooley's Constitutional Limitations, at star pages 303 and 304, it is said:

"But as search warrants are a species of process exceedingly arbitrary in character, and which ought not to be resorted to except for very urgent and satisfactory reasons, the rules of law which pertain to them are of more than ordinary strictness; and if the party acting under them expects legal protection, it is essential that these rules be carefully observed. . . .

"Search warrants are always open to very serious objections; and very great particularity is justly required in these cases, before the privacy of a man's premises is allowed to be invaded by the minister of the law. And therefore a designation of goods to be searched for as 'goods, wares, and merchandise,' without more particular description, has been regarded as insufficient, even in the case of goods supposed to be smuggled, where there is usually greater difficulty in giving description, and where consequently more latitude should be permitted than in the case of property stolen."

In *McClurg* v. *Brenton*, 123 Iowa, 368, 371, 98 N. W. 881, 882 (60 L. R. A. 519, 102 Am. St. Rep. 323), the supreme court of Iowa said:

"The right of the citizen to occupy and enjoy his home, however, mean or humble, free from arbitrary invasion and search, has for centuries been protected with the most solicitous care by every court in the English-speaking world, from Magna Charta down to the present, and is embodied in every Bill of Rights defining the limits of governmental power in our own republic.

"The mere fact that a man is an officer, whether of high or low degree, gives him no more right than is possessed by the ordinary private citizen to break in upon the privacy of a home and subject its occupants to the indignity of a search for the evidences of crime, without a

legal warrant procured for that purpose. No amount of incriminating evidence, whatever its source, will supply the place of such warrant.''

In *People* v. *Halveksz*, 215 Mich. 136, 183 N. W. 752, the supreme court of Michigan held that no power existed at common law to make a search and seizure, as of intoxicating liquors, without a warrant. In the course of its opinion, the Michigan court said:

''Under a government of laws the security afforded persons, houses, and possessions against search without a warrant, lawfully obtained, must not be violated by officers of the law. The law must point the way to legitimate search and seizure and will tolerate none other. Officers of the law must act within the law, and, if they invade the security guaranteed individuals by the Constitution, such invasion cannot bring to the aid of justice the fruit of their violation.''

See, also, *People* v. *Marxhausen*, 204 Mich. 559, 171 N. W. 557, 3 A. L. R. 1505; *Gouled* v. *United States*, 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647; *Amos* v. *United States*, 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654.

In *State* v. *Peterson*, 27 Wyo. 185, 198, 194 P. 342, 345, 13 A. L. R. 1284, 1288, the court said:

''This provision against unreasonable search and seizure has been considered one of the fundamental props of English and American liberty of the individual citizen, and to be most sacredly observed, giving rise to the expression that a 'man's house is his castle,' designed to prevent violation of his private security in property, or the unlawful invasion of the home of the citizen by the officers of the law acting under legislative or judicial sanction, and to give remedy against such usurpations. *Adams* v. *New York*, 192 U. S. 585, 48 L. Ed. 575, 24 S. Ct. 372. The framers of the Constitution 'sought to provide against any attempt by legislation or otherwise to authorize, justify, or declare lawful any unreasonable search or seizure. This restriction was intended to operate on legislative bodies so as to render ineffectual any

effort to legalize by statute what the people expressly stipulated could in no event be made lawful; upon executives, so that no law violative of this constitutional inhibition should ever be enforced; and upon the judiciary, so as to render it the duty of the courts to denounce as unlawful every unreasonable search and seizure; whether confessedly without any color of authority, or sought to be justified under the guise of legislative sanction.' 24 R. C. L. 704.''

In *Batts* v. *State* (Ind. Sup. 1924), 144 N. E. 23, where an automobile was stopped and searched without a warrant and liquor found and the occupant arrested, the court held that unlawful search for liquor does not become lawful because liquor is found, and that the evidence thus secured is inadmissible. See, also, *Callendar* v. *State* (Ind. Sup. 1923), 138 N. E. 817; *Ash* v. *Commonwealth* (1922), 193 Ky. 452, 236 S. W. 1032; *Simmons* v. *Commonwealth* (1924), 203 Ky. 621, 262 S. W. 972; *Adkins* v. *Commonwealth* (1923), 202 Ky. 86, 259 S. W. 32. Holding to the same effect, see *State ex rel. Sadler* v. *District Court* (Mont. 1924), 225 P. 1000; *Thomas* v. *State* (Okl. Cr. App. 1923), 220 P. 976; *State* v. *Warfield* (1924) 184 Wis. 56, 198 N. W. 854; *State* v. *Wills,* 91 W. Va. 659, 114 S. E. 261, 24 A. L. R. 1398.

In *Cobb* v. *State,* 19 Ala. App. 345, 97 So. 779, the supreme court of Alabama, although committed to the rule of admitting evidence obtained by a search regardless of the legality of the search, held that a chief of police had no right without a warrant to search the person of one suspected of having intoxicating liquors based on information that such person is selling whisky, and that where he killed a person resisting such unlawful search, he was not justified. In its opinion the court said:

''The fact that the deceased was a nameless and friendless negro none the less entitles him to the protection of the constitutional guaranties. Indeed these provisions were necessary to be written in the organic law, more for the protection of the poor and friendless, than for the rich

and powerful. Even if defendant had been informed that deceased was 'down there' selling whisky, defendant would have no right to search the person of deceased, based upon such information. A warrant to search the person or premises can only be obtained as is provided by the Constitution and laws of the state. There is only one other way by which an officer can search the person lawfully, and that is, when engaged in making a lawful arrest, either with a warrant duly issued, or for a felony committed by the person arrested, under section 6269 of the Code, or for a public offense committed or a breach of the peace threatened in his presence.''

In *Jackson* v. *State,* 87 Fla. 262, 99 So. 548, the supreme court of Florida held that when a search warrant was obtained as provided by law, both the search warrant and the prerequisite oath or affirmation required for it must conform strictly to the constitutional and statutory provisions authorizing their issue. The place to be searched should not be left to the discretion of the officer, saying that the late authorities are unanimous in holding that a search warrant directing an officer to search places generally is clearly illegal. In its opinion the court said (87 Fla. 264, 99 So. 549) :

''Where searches and seizures are made pursuant to the command of a search warrant, both the search warrant and the prerequisite oath or affirmation required for it must conform strictly to the constitutional and statutory provisions authorizing their issue. This is true, because there is no process known to the law, the execution of which is more distressing to the citizen or that actuates such intense feeling of resentment on account of its humiliating and degrading consequences. As thus enunciated the law is in line with and is no doubt the child of our Anglo-Saxon spirit of liberty which holds every man's house or dwelling as his castle, and which declares that it must not be invaded or subjected to an uninvited search, except by a duly qualified officer,

and then only in pursuance of a valid writ commanding it.''

This opinion is an able one and could be quoted from with profit if space permitted.

In *Banks* v. *State,* 18 Ala. App. 376, 93 So. 293, 24 A. L. R. 1359, the court of appeals of Alabama considered the search and seizure law and recommended in a masterly opinion that the supreme court overrule some of its prior cass which held that evidence though obtained by search on an invalid warrant was admissible. The views therein expressed deserve profoundest consideration. The court refused to overrule the case because, as I think, the Constitution had been re-enacted with the interpretation placed upon it that such evidence was admissible and no change was made. In my opinion the court would have changed its decision but for that fact.

*In re Jackson,* 96 U. S. 727, 24 L. Ed. 877, was a case involving the right of the government to search the mails for prohibited matter being transported through the mails. The court said (96 U. S. 732, 24 L. Ed. 879):

''The difficulty attending the subject arises, not from the want of power in Congress to prescribe regulations as to what shall constitute mail matter, but from the necessity of enforcing them consistently with rights reserved to the people, of far greater importance than the transportation of the mail. In their enforcement, a distinction is to be made between different kinds of mail matter; between what is intended to be kept free from inspection, such as letters, and sealed packages subject to letter postage; and what is open to inspection, such as newspapers, magazines, pamphlets and other printed matter, purposely left in a condition to be examined. Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreason-

able searches and seizures extends to their papers, thus closed against inspection, wherever they may be. Whilst in the mail, they can only be opened and examined under like warrant, issued upon similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subjected to search in one's own household. No law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters and such sealed packages in the mail; and all regulations adopted as to mail matter of this kind must be in subordination to the great principle embodied in the Fourth Amendment of the Constitution.''

In the case of *Bram* v. *United States,* 168 U. S. 532, 18 S. Ct. 183, 42 L. Ed. 568, the supreme court of the United States was considering the provisions of the Fifth Amendment of the United States Constitution, providing protection against self-incrimination, which subject, as stated in other opinions, is closely allied to the search and seizure clause of the Constitution. The court, speaking through Justice WHITE, afterwards Chief Justice said (168 U. S. 543, 18 S. Ct. 187):

''A brief consideration of the reasons which gave rise to the adoption of the fifth amendment, of the wrongs which it was intended to prevent, and of the safeguards which it was its purpose unalterably to secure, will make it clear that the generic language of the amendment was but a crystallization of the doctrine as to confessions, well settled when the amendment was adopted, and since expressed in the text writers and expounded by the adjudications, and hence that the statements on the subject by the text writers and adjudications but formulate the conceptions and commands of the amendment itself. In *Boyd* v. *U. S.,* 116 U. S. 616, 6 S. Ct. 524, attention was called to the intimate relation existing between the provision of the fifth amendment securing one accused against being compelled to testify against himself, and those of the fourth amendment protecting against unreasonable

searches and seizures; and it was in that case demonstrated that both of these amendments contemplated perpetuating, in their full efficacy, by means of a constitutional provision, principles of humanity and civil liberty which had been secured in the mother country only after years of struggle, so as to implant them in our institutions in the fullness of their integrity, free from the possibilities of future legislative change."

This subject is further discussed in the following cases: *Hale* v. *Henkel,* 201 U. S. 43, 26 S. Ct. 370, 50 L. Ed. 665; *Interstate Commerce Commission* v. *Brinson,* 154 U. S. 447, 14 S. Ct. 1125, 38 L. Ed. 1047, 4 Interst. Com. Com'n R. 545; *Interstate Commerce Commission* v. *Baird,* 194 U. S. 25, 24 S. Ct. 563, 48 L. Ed. 860; *Brown* v. *Walker,* 161 U. S. 591, 16 S. Ct. 644, 40 L. Ed. 819, 5 Interst. Com. Com'n R. 369; *Counselman* v. *Hitchcock,* 142 U. S. 547, 12 S. Ct. 195, 35 L. Ed. 1110.

It was said in argument by the learned assistant attorney-general that he had not been able to find in any of the circuit courts of appeal of the United States any case holding that search without warrant was invalid, and that evidence obtained by such search was inadmissible, and that he had found none at all in this, the Fifth circuit, as I recall his argument.

I have been more successful in my examination and refer to the following cases: *United States* v. *Jajesweic* (C. C. A.), 285 F. 789; *Salate* v. *United States* (C. C. A.), 286 F. 125; *Joswich* v. *United States* (C. C. A.) 288 F. 831; *Singleton* v. *United States* (C. C. A.), 290 F. 130; *Pressley* v. *United States* (Cir. Ct. App. 5th Cir.), 289 F. 477; *Agnello* v. *United States* (C. C. A.), 290 F. 671 (a narcotic act case); *Murby* v. *United States* (C. C. A.), 293 F. 849; *Legman* v. *United States* (C. C. A.), 295 F. 474; *Burns* v. *United States* (Cir. Ct. App. 5th Cir.), 296 F. 468; *Hurwitz* v. *United States* (C. C. A.), 299 F. 449.

Of course, the Federal courts, both the district courts and the circuit court of appeals, have conflicting decisions. In other words, they differ upon this question. An ex-

amination of the cases cited above will show that it was very generally understood by the appellate courts and a large number of the Federal courts that the provision in the Constitution against searches and seizures was intended to perpetuate the protection which existed at the common law. The provisions were adopted from the common law of England and the interpretations in force at the time of our independence, and the adoption of the provisions of the Constitution became a part of the Constitution itself under the well-known rule that where any state or government adopts a provision of law from another government which has been construed by the courts of such government, the interpretation so placed upon the provision by such court is accepted as the true meaning of the provision.

In *Falkner* v. *State,* 134 Miss. 253, 98 So. 691, we held that section 23 of the Constitution covered all property of a citizen; that the word "possessions" in our Constitution was broader than the word "effects" in the Federal Constitution, the word "effects" including personal property, and the word "possessions" including both real and personal property of every kind that could be possessed. So far as the case before us is concerned, the automobile would fall within the meaning of either term. We also announced in the Falkner opinion the rule that constitutional provisions designed for the protection of persons are to be liberally construed, following *Boyd* v. *United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746; *Gouled* v. *United States,* 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 649; *Thompson* v. *Grand Gulf R. & B. Co.,* 3 How. (Miss.) 240, 34 Am. Dec. 81. We also held that a Constitution should be construed so as to effectuate and not defeat the policy indicated by its framers, citing *Brien* v. *Williamson,* 7 How. (Miss.) 14.

We have also often cited and quoted from *Boyd* v. *United States, supra; Weeks* v. *United States,* 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; *Silverthorne Lumber Co.* v. *United*

*States,* 251 U. S. 385, 40 S. Ct. 182, 64 L. Ed. 319; *Gouled* v. *United States,* 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 649; *Amos* v. *United States,* 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654—all of which are referred to in *Tucker* v. *State,* 128 Miss. 211, 90 So. 845, 24 A. L. R. 1377.

As I understand our decisions since the *Tucker case, supra,* we have based our holdings upon a construction of the Constitution itself, and this construction was that the Constitution prohibited searches and seizures without a warrant except the limited search incident to a lawful arrest.  These decisions were not based upon a mere rule of evidence, but were based upon the fact that the Constitution ought to be so construed as to prohibit the government deriving any benefit or using any information obtained contrary to its provision.  If I am correct in this, our own construction of our own Constitution would prohibit the legislature from circumventing the protection of the Constitution by the mere enactment of a statute having the legal effect of a general writ of search and seizure.  I am wholly unable to see how a distinction can be drawn between a general search warrant and a statutory search warrant necessarily general in all respects.

I have quoted from the authorities at great length to show that the case of *Carroll & Kiro* v. *United States,* 45 S. Ct. 280, 69 L. Ed. —, decided by the United States supreme court on March 2, 1925, is erroneous and should not be followed by the state court.  Where the United States supreme court is authority, I accept its decisions without question, as it is the duty of all subordinate courts to do.  As it is not authority in the present case, it only has a persuasive effect and should not be followed if it is erroneous.  The constitutional provisions of the state are to be construed according to the policy and political philosophy reflected in its jurisprudence and history.  As the United States supreme court is a court of great ability, great dignity, and great power, and is looked to for leadership by all of the courts of the country, if not of

the world, I differ with it with the greatest reluctance. I approach its decisions with respect and with an inclination to agree with its pronouncements. But where a constitutional provision or statute of our own state is involved (as the construction of such Constitution or statute is primarily for the decision of our state court), I examine with the best attention and ability that I can the philosophy and principles of the United States supreme court and its previous announcements, as well as the previous decisions of our own court, and the political philosophy of our own state as reflected in our Constitution and statutes.

It appears to me that the recent decision of the *Carroll & Kiro case, supra,* speaks a different philosophy from that of the Boyd case, the Weeks case, the Gould case, the Silverthorne case, the Amos case, and other cases hereinbefore set out. The previous cases speak the voice of Liberty and Democracy. They accord to the citizen his full constitutional liberties and rights. The Carroll & Kiro case bespeaks the supremacy of the government over the citizen's constitutional rights—the doctrine of thrones, the doctrine of the Stuart Kings. Instead of going to the common law and tracing the judicial pronouncement on the rights secured by these constitutional provisions as they existed at the common law, the said opinion quotes the enactment of Congress, relying principally upon the enactments of Congress enacted subsequent to the adoption of the first ten amendments of the Constitution and deducing from these enactments the understanding of the people at that time.

The Constitution was adopted to restrain Congress. The first ten amendments were adopted to prevent Congress from passing any law which would abridge or deny any rights against search and seizure and compulsory self-incrimination; among many other things from the encroachment of Congress. It must be remembered that the original Construction as adopted did not contain these amendments. The debates in the convention show that

the convention itself was hostile to them, but when the Constitution was put before the people for adoption, the conventions of the several states which adopted it criticised the absence of the Bill of Rights, and the adoption was only secured by assurances from the friends of the Constitution in such conventions that they would be speedily adopted, and they were adopted for the purpose of satisfying the people of the states; the government could not have been held together without adopting them. If there were no other light to illumine the question, these enactments would have some weight; but where the provisions had been definitely defined and pronounced by the courts and their meaning judicially declared, the court decision is the place to look for light.

With due respect to the high court and to my Brethen who follow it, I say that if this decision is correct the court condemns our forefathers as being rebels against the law in resisting the writs of assistance. These writs were clearly regarded by the colonies as unauthorized, tyrannical, and destructive of human liberty. The Virginia courts and the courts of England declared them unlawful. When the Constitution was first framed, the people with practically unanimous voice inserted the provisions to protect themselves against the powers of the government they were setting up. The person, home, and property of the citizen were to be secured against general invasion by the officers of the government, and any search or seizure was regarded at that time as being unauthorized and unreasonable unless the person seeking the warrant made oath as to the probable cause and particularly described the person and property to be searched for and seized.

There is a marked distinction between the right of the government to search a vessel coming to its ports to see that prohibited goods are not brought in and that proper taxes are paid, and the right to search individual possessions within the domain of a country. A person, even though a citizen of this country, when he goes without

its jurisdiction carrying the protection of his govern-
ment with him, must submit of necessity to reasonable
requirements to see that he does not violate the revenue
laws of the country or bring in forbidden goods. But
when a person is within the jurisdiction of the govern-
ment, subject to the orderly processes of law, there is no
well-grounded reason founded in necessity for a search
or seizure without a warrant. The automobile and other
rapid moving vehicles do not change the *status* at all.
At the time the original Constitutions were adopted, it
was much more difficult to make arrests, searches, and
seizures, and procure proper warrants than it is now.
A person who violated the law in that day could mount
a horse and escape the officers by getting beyond the
county lines. The outlaw and the officer were on equal
terms so far as speed was concerned, and so are they now.
Now in this day and time of swift movement, officers can
use the same rapid moving vehicle that the lawbreaker
can. He can go further; he can continue the pursuit from
one county to another until he overtakes the outlaw. If
the outlaw gets beyond the confines of the state, it is easy
now on account of the telephone, telegraph, and wire-
less to locate such outlaw and have him returned under
extradition proceedings.

It is difficult for me to understand how a court can in-
graft an exception upon a provision of the Constitution.
The papers and effects of the citizen under the Federal
Constitution are as fully protected as the home or build-
ing or person. It seems that the supreme court intends
to preserve the houses and buildings from search without
a warrant and subject moving vehicles to search without
a warrant.

The attempted breaking down of the distinction be-
tween felonies and misdemeanors in the law, authoriz-
ing arrest without a warrant in the *Carroll & Kiro case,*
*supra,* in the supreme court of the United States, and in
the majority opinion in this case, is untimely, illogical,
dangerous. The reason for allowing arrest without war-

rant on probable cause for belief that the person sought to be arrested had committed a felony was founded on the doctrine of necessity growing out of the highest degree of probability that such felon would flee, due to the severity of the law as it then existed in imposing not only severe penalties, but in confiscating the property in case he was found guilty and in the many civil incapacities that followed a conviction. The felon after conviction was rendered infamous and could not thereafter be a witness, hold office, inherit or transmit property, etc. In case of a misdemeanor no such incapacities were inflicted and the punishment was slight in comparison. A misdemeanor at common law did not amount to much—was regarded as merely an option of committing the offense and paying for it the fine imposed by law. It was *mala prohibita* and not *malum in se*. It was not reasonable to believe that a person would flee the realm for so slight an offense. There was no necessity for immediate arrest. The distinction between felonies and misdemeanors is still great, the one rendering the offender infamous though with great abatement of the legal consequences in the nature of incapacities. A misdemeanor does not seriously affect the person, reputation, or civil rights of the person convicted. The fact that the lawmaking bodies have made changes in the penalties of the law, reducing the penalties and consequences of felonies and increasing the punishment in misdemeanors, and in some cases converting misdemeanors into felonies, and in other cases changing felonies to misdemeanors, does not affect the philosophy of the rule, but merely shows that the original reason for the rule making it lawful to arrest for felonies without warrant, on probable cause, is passing away. It is getting more and more difficult for a felon to escape arrest under the ordinary process of law owing to the many means of communication, identification, and extradition. To authorize an officer to arrest without warrant on suspicion or hearsay information for an offense not committed in his presence, and thus harass, and

138 Miss.—13.

discommode a citizen, peaceably within the jurisdiction of ordinary process, will speedily become intolerable.

It is unfortunate, I think, that the liberty and privacy and immunity from arrest and search are to be placed in the control of persons who will willfully lie to get some person to violate the law or agree to do so, and thereafter place such person in their power as was done in the *Carroll & Kiro case, supra.* In that case the prohibition agents represented falsely that they were working for the Michigan Chair Company at Grand Rapids, Mich., which was a deliberate falsehood. They procured no whisky by this misrepresentation, but a mere promise which was unfulfilled to deliver whisky. Thereafter, meeting these parties on a highway with nothing to indicate that they had liquor in their possession, they made the search. It seems to me that as desirable as it may be to enforce the law, it is more desirable still to preserve the constitutional safeguards of liberty. There are those living in the realm of Utopian musardy, who believe that the millenium will be brought about by clothing a constable with dictatorial powers. There are those who would burn down a barn rather than permit the rats to escape. But such was not the faith of the Fathers, and I cannot bring my mind to accept that philosophy. I believe in the enforcement of the law fully and effectively so far as it can be done under the restraints of law necessary for the protection of the liberty of the whole people. I do not believe that the outlaw by his wrongdoing should be able to destroy the liberty of a whole people. I believe the officers charged with enforcing and administering the law are equally bound to observe the law. I do not believe in outlaw law enforcement. In other words, I do not believe either in making outlaws of our officers or in clothing them with plenary power to arrest and search on mere rumor, suspicion, or hearsay testimony.

In the case before us there was no reason why a warrant could not have been procured. The chief of police

and the police justice have offices in the same building. There are two other justices of the peace within two or three blocks of the city hall. There is no showing in the record that a search warrant could not have been obtained. The doctrine announced in the majority opinion in this case will make petty tyrants of policemen, constables, and other officers having the right to arrest. The evils that will flow from this decision will be as mountains compared to molehills when contrasted with those that now exist. I therefore refuse to assent to the decision pronounced.

ANDERSON, J., concurs in this dissent.